Catherine McCARTHY, Executrix of the Estate of David J. McCarthy, deceased; and Catherine McCarthy in Her Own Right; and Catherine McCarthy as Parent and Natural Guardian of Casey McCarthy and Ryan McCarthy, Minors, Appellees,

v.

William J. BAINBRIDGE, M.D., Paoli Family Medicine and Bainbridge, Groves & Yelovich, Individually and Trading as Bainbridge, Groves & Yelovich, P.C., a Pennsylvania Professional Corporation, and the Pennsylvania Property and Casualty Insurance Guaranty Association, as Intervenor, Appellants.

Superior Court of Pennsylvania.

Argued April 28, 1999.

Filed Sept. 24, 1999.

Lise Luborksy, Philadelphia, for PA Property & Cas. Ins. Guar. Assoc., appellant.

Joan O. Ford, Doylestown, for William J. Bainbridge, M.D., Paoli Family, etc. appellants.

William C. Archbold, Jr., Media, for appellee.

Before DEL SOLE, MONTEMURO * and BECK, JJ.

BECK, J.:

¶ 1 This case presents a question of first impression involving the proper interpretation to be given to § 991.1817 (Non-duplication of recovery) of Article XVIII of the Insurance Department Act, in which the functions and responsibilities of the Pennsylvania Property and Casualty Insurance Guaranty Association (PIGA) are set forth. 40 P.S. § 991.1817, the non-duplication of recovery provision, The question is whether section 991.1817 permits PIGA to offset amounts received by a claimant under a life insurance policy against the amount PIGA would otherwise owe the claimant. Under the statutue PIGA is the guarantor of of monies owed a claimant by a medical malpractice insurer who is insolvent. The trial court concluded that the statute does not permit such an offset. We affirm.

¶ 2 On September 25, 1992, appellees (collective by "the McCarthys") initiated a suit for malpractice against appellants in the death of David McCarthy. In January 1998, the parties reached a negotiated settlement in the total amount of $950,000. The liability insurer for the appellants, PIC Insurance Group, Inc. ("PIC") was responsible for payment of $200,000 of the negotiated settlement.[1] Two days after the parties agreed to the settlement, the Commonwealth Court issued an Order of Liquidation placing PIC in liquidation and appointing the Insurance Commissioner as statutory liquidator of PIC. Since PIC was insolvent, it did not pay its portion of the settlement. By operation of law, the McCarthy's claim against PIC became a claim against PIGA. *See generally 40 P.S. § 991.1801 et seq.*

¶ 3 PIGA refused to honor the McCarthys' claim on the ground that the decedent had a life insurance policy providing a benefit of $584,216.84, all of which had already been paid to the McCarthys. PIGA argued that under the "Non-duplication of Recovery" provision of the Insurance Department Act, the $200,000 claim against PIGA was entirely offset by the life insurance proceeds the McCarthys had received. Therefore, PIGA contended that it was not compelled to make any contribution toward payment of the negotiated settlement.

¶ 4 On June 9, 1998, the McCarthys filed a Petition to Enforce the Settlement. PIGA petitioned for and was granted leave to intervene. The trial court conducted a hearing and, on October 8, 1998, issued an order granting the Petition to Enforce. This timely appeal ensued.

■ ¶ 5 The statutory provision at the center of this controversy is § 991.1817 of the Insurance Department Act,[2] which provides:

**Non-duplication of recovery**

(a) Any person having a claim under an insurance policy shall be required to exhaust first his right under such policy. For purposes of this section,

---

* Retired Justice assigned to Superior Court.

1. The remaining $750,000 was to be paid by the Medical Professional Liability Catastrophe Fund. This portion of the settlement is not in dispute in this appeal.

2. As an alternative ground for affirmance, appellees argue that this version of section 991.1817 does not apply to this case because it includes amendments to the section that were adopted in 1995, several years after appellees' cause of action arose. Appellees argue that the former version of section 991.1817 applies and that under the clear language of that version, PIGA may not offset life insurance proceeds against a covered claim. The trial court did not address this issue. We need not devote significant analysis to it since we decide that even under the present form of section 991.1817, offset of life insurance proceeds is not permitted. However, we do note that the statute itself states that it is applicable to unpaid claims against an insurer that was declared insolvent after the statute's effective date, i.e., 60 days after December 12, 1994. The fact that appellees' cause of action arose prior to that date is irrelevant and does not exempt appellees from the applicability of the amended statute.

a claim under an insurance policy shall include a claim under any kind of insurance, whether it is a first-party or third-party claim, and shall include, without limitation, accident and health insurance, worker's compensation, Blue Cross and Blue Shield and all other coverages except for policies of an insolvent insurer. Any amount payable on a covered claim under this act shall be reduced by the amount of any recovery under other insurance.

¶ 6 The trial court concluded that when this provision is read in the context of the PIGA statute as a whole, the provision must be interpreted only to require a set-off from any other property or casualty insurance benefits payable for the same loss since the entire statutory scheme concerns itself with property and casualty insurance. Appellants argue that despite the general applicability of the statute to property and casualty claims, the non-duplication of recovery provision refers to "any kind of insurance," and must be interpreted and applied regardless of the general purposes or applicability of the statute.

¶ 7 We are required by well established principles of statutory construction to give effect to all of a statute's provisions and to presume that the legislature does not intend an absurd or unreasonable result. *1 Pa.C.S.A. §§ 1921, 1922.* Therefore, we must construe § 991.1817, the non-duplication of recovery provision, in a manner that produces a just and reasonable result. In doing so, we must keep in mind that the primary function of PIGA is to provide protection to claimants whose insurers have become insolvent. As the Purpose section of the PIGA statute states:

¶ 8 The purposes of this article are as follows:

(1) To provide a means for the payment of covered claims under certain property and casualty insurance policies, to avoid excessive delay in the payment of such claims and to avoid financial loss to claimants or policyholders as a result of the insolvency of an insurer.

(2) To assist in the detection and prevention of insurer insolvencies.

(3) To provide for the formulation and administration by the Pennsylvania Property and Casualty Insurance Guaranty Association of a plan of operation necessary to effectuate the provisions of this article.

40 P.S. § 991.1801

¶ 9 As the Supreme Court of Pennsylvania has stated, PIGA was created "to give a measure of protection to policyholders and claimants who are faced with financial loss because of the insolvency of certain carriers of property and casualty insurance." *Bethea v. Forbes,* 519 Pa. 422, 424–25, 548 A.2d 1215, 1216 (1988). Thus, PIGA is a statutory insurer specifically created for the protection of claimants, like the McCarthys, who are the innocent victims of an insurer's insolvency.

¶ 10 Appellants assert that the non-duplication of recovery provision is clear on its face and requires the setoff of every conceivable claim any claimant against PIGA has under any kind of insurance. They ask us to focus exclusively on one phrase in the section, i.e., "any kind of insurance." Such an interpretation leads to an unjust, unreasonable and absurd result. Broadly applied, appellants' interpretation would mean that there need be *no* connection between the claim asserted against PIC, the doctors' insolvent malpractice insurer, and the other claim that must be offset under § 991.1817. Hypothetically, then, if appellees in this case had a totally unrelated claim for a loss of property under an ocean marine policy, they would be required under § 991.1817 to offset that claim against their claim against PIGA resulting from the alleged medical malpractice of the insolvent insurer's insured doctors. Since this is a clearly absurd result, and yet is a necessary corollary of appellants' argument, we must

reject appellants' overly simplistic construction of this statutory provision.

■ ¶ 11 Rather, we conclude that there must be some relationship between the claim against PIGA and the claim under other insurance that must be offset. The only reasonable reading of the offset provision is to require that the claim to be offset must be for the same loss as the claim asserted against PIC. In other words, the claim must be under insurance that sought to protect the insured against the same risk as was covered by the now insolvent insurer for whom PIGA is providing coverage. That is not the situation with which we are presented in this case. Here, the medical malpractice insurance provided by the now insolvent insurer was casualty insurance, which is generally defined as:

> That type of insurance that is primarily concerned with losses caused by injuries to persons and legal liability imposed upon the insured for such injury or for damage to the property of others.

Black's Law Dictionary, at 721 (5th ed.1979).

¶ 12 In contrast, life insurance is generally defined as:

> A contract between the holder of a policy and an insurance company (i.e., the carrier) whereby the company agrees, in return for premium payments, to pay a specified sum (i.e., the face value or maturity value of the policy) to the designated beneficiary upon the death of the insured.
>
> That kind of insurance in which the risk contemplated is the death of a particular person.

*Id. at 723.*

¶ 13 As these rudimentary definitions indicate, life insurance and medical mal-practice liability casualty insurance are fundamentally different, most notably because they insure against different risks and protect against different types of loss. Life insurance provides a defined benefit payable upon death, whether accidental or from natural causes, to designated beneficiaries. Medical malpractice liability insurance provides coverage for amounts the insured (*i.e.,* the doctor) is held legally liable to pay others because of the doctor's own negligence and the harm it caused.

■ ¶ 14 Our conclusion is further buttressed by the heading of § 991.1817, *i.e.,* "Non-duplication of recovery."[3] The heading itself raises a question—recovery for what? The answer to that question determines the circumstances under which a claimant can be seen as recovering twice, *i.e.,* "duplicate" recoveries, since it is not duplicative to recover twice when each recovery is for a different loss. Clearly, the provision only prohibits recovering duplicatively, *i.e.* twice for the *same loss.*

¶ 15 Interpreting § 991.1817 in this manner achieves a fair result and furthers the purposes of the PIGA statute.[4] It recognizes that PIGA should not be responsible for paying a claimant who has already received coverage for his or her claim from other insurance provided by a solvent insurer that protects the claimant against the same loss. However, it also recognizes that PIGA cannot avoid liability where a claimant has no other insurance to look to for that loss.

¶ 16 Since in the instant case the appellees would not recover duplicatively if they are allowed to recover against PIGA without any offset of the life insurance proceeds they have already received, they should not be required to offset those proceeds. PIGA should be liable to the same

---

3. Although statutory section headings are not controlling in interpreting a statute, they may be considered. 1 Pa.C.S.A. § 1924.

4. We note that M. Diane Koken, the Pennsylvania Insurance Commissioner, has filed an amicus curiae brief in which the Commissioner agrees that only other insurance protecting the insured or claimant against the same loss should be considered to fall within the offset requirement of § 991.1817.

extent it would be had appellees not received any life insurance proceeds.

¶ 17 The order of the trial court is affirmed.

¶ 18 MONTEMURO, J., files a Dissenting Opinion.

MONTEMURO, J., Dissenting:

¶ 1 The threshold inquiry here is whether application of the non-duplication provision of the Guaranty Act statute requires offset of the decedent's life insurance proceeds against the settlement amount due from PIGA as a substitute for an insolvent insurer. Because I believe the reasoning which leads to the Majority's negative response to this question is incorrect, I dissent.

¶ 2 The text of the non-duplication provision reads as follows:

**§ 991.1817. Non-duplication of recovery**

(a) Any person having a claim under an insurance policy shall be required to exhaust first his right under such policy. For purposes of this section, a claim under an insurance policy shall include a claim under any kind of insurance, whether it is a first-party or third-party claim, and shall include, without limitation, accident and health insurance, worker's compensation, Blue Cross and Blue Shield and all other coverages except for policies of an insolvent insurer. Any amount payable on a covered claim under this act shall be reduced by the amount of any recovery under other insurance.

¶ 3 The trial court reasoned that the Act concerns itself "with the insolvency of property and casualty insurance companies and not with the subject of insurance generally." (Trial Ct. Op. at 3) And, although "[e]veryone dies, ... everyone does not have the kind of things happen which give rise to claims under accident and health insurance, workers compensation and things of that sort." (*Id.* at 3–4). Thus, since life insurance differs in kind from the usual casualty loss, and since the statute does not specifically refer to life insurance, which the Legislature could have included had it wished to do so, what is meant in the clause by the phrase "any kind of insurance" is "any kind of property or casualty insurance." (*Id.* at 4). This reading is buttressed by the specific exclusion of life insurance from among those coverages listed in the Act as property or casualty insurance. (*Id.*). *See* § 991.1802.

¶ 4 The first of the stated purposes of the Act is "[t]o provide a means for the payment of covered claims under certain property and casualty insurance policies, to avoid excessive delay in the payment of such claims and to avoid financial loss to claimants or policyholders as a result of the insolvency of an insurer." 40 P.S. § 991.1801(1). In the instant case, the stated purpose of the statute appears to be pitted against the express limitations on recovery which appear in the language of § 991.1817. I believe that the Rules of Statutory Construction, 1 Pa.C.S.A. § 1901 *et seq.*, as well as the principles of Pennsylvania jurisprudence, require that the statutory language be given precedence, and that in fact, the dissociation between theory and practice is apparent rather than real.

¶ 5 The well settled principle which compels my conclusion is reiterated in *Blackwell v. Pennsylvania Insurance Guaranty Association*, 390 Pa.Super. 31, 567 A.2d 1103 (1989). There a panel of this Court repeated in the context of a dispute over the meaning of the predecessor provision to the one under consideration, the axiom that "where the words of a statutory enactment are clear and unambiguous, the courts must construe the statute according to its plain and obvious meaning." *Id.* at 1105; 1 Pa.C.S.A. § 1921(b). Nor is the "letter of [the statute] to be disregarded under the pretext of pursuing its spirit." 1 Pa.C.S.A. § 1921(b). Here, although the words themselves are not problematic, the trial court determined that they were inconsistent with the intent of the Legisla-

ture, and supplied meaning to correct what it saw as an inadvertent omission in the language of § 991.1817. The Majority, without reference to any supporting authority, adopts this position, finding that the plain meaning of the language leads to an "unjust, unreasonable and absurd result." (Majority Op. at 202).

¶ 6 However, the Legislature's repeated use in the subsection of inclusive language—"any kind of insurance," "all other coverages," and "any recovery"—persuades me that the words mean exactly what they say, that is, every kind of insurance "except for policies of an insolvent insurer" may be used to offset PIGA's liability. Further, the Rules of Statutory Construction direct that in determining the intent of the Legislature, it is presumed that "the public interest is favored as against any private interest," 1 Pa. C.S.A. § 1922(5); *Pennsylvania Assigned Claims Plan v. English*, 541 Pa. 424, 664 A.2d 84 (1995), which brings me to the purpose of the statute, noted above.

¶ 7 In reaching its conclusion that statutory intent is to be discerned by ignoring the express language of the Act, the Majority engages in a *reductio ad absurdum*, reasoning that the inevitable result of accepting the plain language of the statute would require a totally unrelated claim, such as a loss of property under a marine policy, to be used as an offset. Therefore there must be "some relationship between the claim against PIGA and the claim under other insurance that must be offset." (Majority Op. at 203). The nature of the relationship must be such that the "claim to be offset must be for the same loss," that is, the insurance to be used as an offset must be against the same risk. (*Id.*)

¶ 8 The marine insurance example supplies no valid analogue to the case at bar. Despite the Majority's refusal to recognize it as such, there is "some relationship" here—a death, covered by life insurance, the payment of which arose through an act conceded to impose liability upon an insured holding a policy issued to cover such

acts. We are thus not confronted with the necessity of determining whether totally unconnected events fall within the ambit of the statute. Rather, the Majority has posited the necessity for duplication of facts as prophylaxis against duplication of payment.

¶ 9 If the Majority's gloss on the requisite nature of a (compensable) relationship is accepted, its reasoning would dictate that only casualty insurance, specifically, insurance against possible injury suffered at the hands of a negligent medical practitioner, would be available as an offset, since that is, under the Majority's schema, the sole coverage against the "same risk." Despite the argument that this is the only sort of insurance that could have been intended by the prohibition against duplication in the statute, such a result assaults not only logic and common sense, but suggests that the expansive language of the statute be disregarded altogether, and replaced with words of restriction. Even assuming for argument's sake the desirability of such a course, it is for the Legislature, not the courts.

¶ 10 PIGA is an entity constituted by the Legislature specifically to stand in the shoes of insolvent insurers, *Bethea v. Forbes*, 519 Pa. 422, 548 A.2d 1215 (1988); § 991.1803(b)(1)(i), and to facilitate payment due from such insurers to claimants who would otherwise be forced to seek redress though involvement in the liquidation process. The Act was intended to circumvent the delay involved in pursuing a proof of claim in this manner. Its funds are derived from a levy against its insurer members, § 991.1808, and are finite. This court observed in *Blackwell, supra,* that "a claimant will never be placed in a **better** position by virtue of the existence of PIGA than he would have been had the insurance company not become insolvent. However, it is equally clear that the Legislature did **not** intend, in enacting the Insurance Guaranty Act, that in all cases a claimant would be placed in the **same** position he would have been in had the insurance com-

pany remained solvent." *Id.* at 1106 (emphasis in original). Despite some differences in the statute involved in *Blackwell* and here, this cardinal principle remains unchanged.

¶ 11 The statute is intended to protect both insureds and claimants from the insolvency of insurers, and to pay such amounts, limited by a $300,000 cap, § 991.1803(b)(1)(I)(B), as cannot be covered by proceeds from elsewhere. Because the statute includes both first and third party coverages, the fact that the decedent derived no benefit from his policy is not material to the inquiry. What the nonduplication of recovery provision prevents is a situation in which an insured collects the amount of the total loss from one insurance company and then receives an additional sum from the PIGA, reducing the funds available for claimants with no recourse other than to PIGA. That this is true can be seen from the language of the statute.

¶ 12 A covered claim under the Act is "[a]n unpaid claim ... submitted by a claimant, which arises out of and within the coverage and is subject to the applicable limits of an insurance policy to which this article applies issued by an insurer if such an insurer becomes an insolvent insurer after the effective date of this article." 40 P.S. § 991.1802. The insurance policy to which "this article" applies is the malpractice coverage issued to Appellant Bainbridge and his group. PIGA stands in the shoes of the insolvent insurer, but only to the extent of the cap and the restrictions imposed by the Act. Neither the language of the statute nor the intent of the Legislature garnered from that language promises absolute dollar for dollar replacement of losses represented by the claims. In considering the purpose clause of the prior Act, 40 P.S. § 1701.102(1), which is repeated verbatim in the current statute, 40 P.S. § 1802(1), the Pennsylvania Supreme Court in *Bethea* points out, as has already been noted, that the Act is intended to provide "*a measure* of protec-

tion to policyholders and claimants," *Id.* at 424, 548 A.2d at 1216 (emphasis added), not total replacement coverage. Had it been otherwise, the words "unpaid loss" would have been used instead of "unpaid claims." The insolvency of the insurer is compensated only to the extent permitted by the limitations already noted. The trial court's reading supplies the deficiency. However, neither this Court nor the trial court is empowered to make the insertions contemplated by the Majority. *See Kusza v. Maximonis,* 363 Pa. 479, 70 A.2d 329 (1950); *Key Savings and Loan Association v. Louis John, Inc.,* 379 Pa.Super. 226, 549 A.2d 988 (1988), *appeal denied,* 523 Pa. 632, 564 A.2d 1260 (1989).

¶ 13 The circumstances of Appellees' claim cannot be characterized as other than tragic, and their dissatisfaction with any diminution of their recovery is understandable. However, I believe, consistent with *Bethea, Blackwell* and the intent of the Legislature as demonstrated by its unequivocal language, that life insurance is "any kind of insurance" available for offset against proceeds due from PIGA. Accordingly, I dissent.