# Branch v. Ledesma

*Robert E. Slota Jr.,* for plaintiff.
*Robert B. Mulhern Jr.,* for defendants.

BERNSTEIN, *J.,* June 15, 2001—This appeal arises from a medical malpractice case tried before the Honorable Mark I. Bernstein from August 7, 2000 to August 11, 2000. At the conclusion of the evidence, the jury found defendants, Dr. Ledesma and Oncology Associates Ltd., liable to plaintiff, Sheryle Branch, and awarded damages in the amount of $4.48 million. Defendants seek a new trial on the grounds that the verdict was against the weight of the evidence and that the court committed error in permitting medical expert testimony. In the alternative, defendants request remittitur alleging the verdict was excessive and further that the verdict be reduced by any amounts paid to Ms. Branch by her health insur-

ance. Defendants' post verdict motion was denied on December 22, 2000.

On December 2, 1996, Ms. Branch, age 46, went to see her family doctor, Dr. Sultz, after detecting a lump in her left breast. Dr. Sultz felt a "pea-sized lump," ordered a mammogram, and referred Ms. Branch to see an oncologist, Dr. Ledesma.[1] When Dr. Ledesma saw Ms. Branch a few days later, he examined the breast and palpated the lump. He read the mammogram report, which said that breast cancer could not be ruled out since Ms. Branch had dense breast tissue.[2]

No additional tests were performed.[3] Dr. Ledesma told Ms. Branch that she had fibrocystic breasts, and that she "was going to be fine" and that the lump would go away.[4] Ms. Branch was told to return to her family doctor in one year.[5]

Seven months later, on June 6, 1997, Ms. Branch returned to Dr. Sultz because the lump in her breast had gotten bigger. Dr. Sultz felt that lump and noted that it felt much larger.[6] Dr. Sultz called Dr. Ledesma and requested that Ms. Branch be seen that day.[7] Ms. Branch went to Dr. Ledesma's office and was seen by his partner, Dr. Lerner. The mass in Ms. Branch's breast was

---

1. N.T. 8/7/00, at 74-75; 8/9/00, at 445.
2. N.T. 8/7/00, at 82-84; 91-93; 8/8/00, at 280; 8/9/00, at 442-44.
3. N.T. 8/8/00, at 280.
4. N.T. 8/8/00, at 280-82.
5. N.T. 8/8/00, at 280-83.
6. N.T. 8/7/00, at 16-17.
7. N.T. 8/8/00, at 288-90.

aspirated, malignant cells were detected and a biopsy was ordered.[8] Ms. Branch was diagnosed with breast cancer. In addition, enlarged lymph nodes under her armpit were discovered. These enlarged lymph nodes signaled that the cancer had spread beyond the primary breast tumor.[9] Upon the diagnosis of cancer, Ms. Branch was subjected to aggressive treatments, including a mastectomy, chemotherapy, radiation and a bone marrow transplant.[10]

Plaintiff presented the expert testimony of Dr. Glover, who said that Dr. Ledesma's failure to diagnose Ms. Branch's breast cancer in December of 1996 altered her course of treatment and chances of survival. Ms. Branch's chances of surviving breast cancer went from more than 80 percent, if she had been diagnosed in December, to less than 20 percent at present. Had the cancer been detected in December, Ms. Branch would not have required a mastectomy or chemotherapy or a bone marrow transplant.[11] Due to the delay in diagnosis and treatment, Ms. Branch was forced to undergo more radical treatment, which has caused debilitating side effects. She was disabled by painful swelling and weakness in her left arm, from her medical care.[12] She has been unable to work and lost her job as a nurse's aid. She has also lost the health insurance that went with her job, and has been forced to go on medical assistance to get medical care.[13]

8. N.T. 8/8/00, at 290-93.

9. N.T. 8/7/00, at 113.

10. N.T. 8/8/00, at 297-311.

11. N.T. 8/7/00, at 119-23.

12. N.T. 8/7/00, 133-34.

13. N.T. 8/8/00, at 313-21.

Ms. Branch suffered pain, nausea, weakness, hair loss, skin burns and other health effects from her advanced cancer and treatment. Due to the illness and disfigurement, Ms. Branch's long-term romantic relationship ended. At a critical time in her life she lost the loving support of a long-term friend. She has endured a diminished self-image, diminished independence and a general loss of enjoyment of life.[14] She fears an unnecessarily premature demise.

The first issue on appeal is whether the verdict was supported by the evidence. Dr. Ledesma alleges the verdict was against the weight of the evidence and therefore he is entitled to a new trial. The jury was properly instructed that Ms. Branch had the burden of proof. Ms. Branch presented evidence on negligence and damages. While Dr. Ledesma presented evidence that contradicted Ms. Branch's evidence, such contradiction does not render the verdict against the weight of the evidence. The jury was free to accept or reject any evidence presented, and it was within their province to weigh the evidence presented by both sides. The evidence clearly demonstrated grounds for both liability and damages.

Significant evidence was presented on the issue of liability. As Ms. Branch's doctor, Dr. Ledesma clearly had a duty to treat her within an appropriate standard of care. Dr. Glover, an expert in the field of oncology, testified that Dr. Ledesma breached the standard of care in several respects. Specifically, Dr. Ledesma failed to obtain a complete and correct history, failed to have the patient in a supine position when he examined the breast, failed

---

14. N.T. 8/8/00, at 297-313; 324-27; 339-43; 8/9/00, at 385-99.

to order further tests available at the time such as an ultrasound or biopsy, and failed to have her return in a week or two to recheck the area where the patient reported the lump. Further, Dr. Ledesma improperly advised Ms. Branch that the condition was benign and would go away.[15] As a result of Dr. Ledesma's failure to diagnose Ms. Branch's breast cancer, she developed late-stage breast cancer, was forced to undergo a mastectomy and other more aggressive treatment, and her life expectancy was reduced from over 80 percent chance of survival, to less than 20 percent. Thus, the verdict was clearly supported by the evidence.

Second, Dr. Ledesma objects to the portion of Dr. Glover's testimony in which she mentioned an MRI as a tool that could be used to evaluate a breast lump.[16] The statement Dr. Ledesma finds objectionable occurred as follows during direct examination:

"[Mr. Slota] Q: Did Dr. Ledesma do any tests on the lump that Sheryle Branch felt?

"[Dr. Glover] A: No, he did not. He did not order a biopsy.

"Q: Did he order an ultrasound of the breast?

"A: He did not order an ultrasound. He did not order any x-rays or mammogram with a marker overlying the area, or extra special views that could be done of the area. He did not order any other diagnostic studies which some places now have available, such as MRI scans or anything.

---

15. N.T. 8/7/00, at 148-49.
16. N.T. 8/7/00, at 85-86.

"Mr. Pitt: Objection, Your Honor, as to what is available now.

"The Court: Overruled." [17]

This statement about the MRI was not made in response to a question about whether Dr. Ledesma breached the standard of care. Rather, it was made in response to an inquiry as to what further tests Dr. Ledesma ordered. There is no basis for defendants argument that Dr. Glover's opinion as to Dr. Ledesma's negligence is based on an assertion that Dr. Ledesma should have used technology that was unavailable. Dr. Glover's opinion as to the standard of care was in no way dependent on the assertion that Dr. Ledesma could have used MRI technology. Dr. Glover's testimony as to the standard of care, was clear:

"[Mr. Slota] Q: Do you have an opinion, Doctor, to a reasonable degree of medical certainty, as to whether Dr. Ledesma's actions at that December 13, 1996 office visit were in accordance with acceptable medical practice?

"[Dr. Glover] A: Yes, I do.

"Q: What is your opinion?

"A: My opinion is, they were not in accord with acceptable medical practice for evaluating a breast lump as described.

"Q: And could you explain why that is?

"A: Several reasons. A complete history was not obtained. There was no recording in the record that the patient had ever had breast problems. In particular, the pa-

---

17. N.T. 8/7/00, at 85-86.

tient told him, and Dr. Sultz, the family doctor who referred her to Dr. Ledesma to evaluate a pea-sized lump, at the time that she saw him, approximately a month had already passed since the first noticing or on physical exam by the patient of this lump. He failed to get that history and record that history, and he failed to diagram or describe in his note the actual location of that pea-sized area.

"He did not exam [sic] in the sitting position, rather than the supine position, although he states in the deposition that he doesn't clearly remember the office visit; only what's written in his record, that, generally, he does sitting and supine examinations. He felt the area where the breast lump was. In particular, the patient said, 'I put his hands right on top of [sic] area to show him what I was feeling, and he said that he felt fibrocystic disease; no need to worry; this was not cancer.' This was something that was probably just going to go away, or benign, and there's nothing that she needed to be concerned with. That she should just come back to the family doctor for a yearly physical examination, including the breasts, and a yearly mammogram.

"And he did not order any other tests or studies. In particular, he did not order an ultrasound to see if there was a discreet or different area of density that could be a cyst or solid mass. But even if nothing was seen on the ultrasound, if there was a mass that she felt, and her family doctor felt, that was pea-sized, and she put his hand on top of that, it was a deviation not to order an ultrasound or do a needle aspirate to prove if it was cystic or solid.

"It already had lasted for months. And her period had occurred during that time period. If it persisted after that menstrual period, four weeks having passed since the initial palpation of the lump by the patient, then he should have said, 'We cannot rule out a lump if a lump is so solid is cancer versus benign without the biopsy.' Other tests might help us, sway us in this direction or that. But an excisional piece of normal tissue; *i.e.,* breast tissue around it, would then be able to allow us to take this pea-sized lump, have the pathologist cut it up into pieces, put it on a glass slide, and the pathologist would look under the microscope of the entire specimen and be able to see if there was any cancer in the lump.

"He also did not tell her to see another doctor, to have Dr. Lerner see her. If he was unable to feel precisely what she was saying, she could come back in a week or two, or have another person's opinion. But she said, at that time when she saw him, there was no dominant mass, but he didn't say there was no mass." [18]

Next, Dr. Ledesma alleges that he is entitled to a remittitur. Dr. Ledesma's allegation that the amount of the verdict was not supported by the evidence is without merit. It is the duty of the jury to assess and award damages. It is well established that remittitur will only be ordered, when "a verdict that is supported by the evidence suggests that the jury was guided by partiality, prejudice, mistake or corruption." [19] There is no indica-

---

18. N.T. 8/7/00, at 93-96.

19. *Krysmalski v. Tarasovich,* 424 Pa. Super. 121, 147, 622 A.2d 298, 312 (1993).

tion that the jury was guided by partiality, prejudice, mistake or corruption.

In *Kemp v. Philadelphia Transportation Corp., infra,* the Superior Court set out the standard for determining whether or not a verdict was excessive. The following factors ought to be considered: (1) the severity of the injury, (2) whether plaintiff's injury is manifested by objective physical evidence or whether it is only revealed by the subjective testimony of plaintiff, (3) whether the injury will affect plaintiff permanently, (4) whether plaintiff can continue with his or her employment, (5) the size of out-of-pocket expenses and (6) the amount the plaintiff demanded in the original complaint.[20]

Based on these factors, there is no basis for this court to grant a remittitur, as Ms. Branch presented detailed evidence about the severity of damages she suffered. The damages she complains of include not only subjective damages, such as lower sense of self esteem, depression, embarrassment and humiliation, and fear of losing her life, but also objective damages, such as having to undergo a mastectomy, having to undergo chemotherapy, radiation and a bone marrow transplant and all of the side effects accompanied by these treatments. These injures are permanent; they will affect her the rest of her life. They have decreased her chances of survival from over 80 percent to less than 20 percent. In addition to physical damages, Ms. Branch has suffered financially. She lost her job and her health benefits, and she continues to be unemployed. David Bunn, an expert actuarial

---

20. *Kemp v. Philadelphia Transportation Corp.,* 239 Pa. Super. 379, 361 A.2d 362 (1976).

economist, testified that these special damages alone include over $81,000 in past lost wages and benefits, and up to $530,000 in future lost earnings and benefits.[21] In addition, both parties stipulated that the medical expenses totaled over $160,000.[22] Ms. Branch suffered special damages amounting to over $770,000. Based on this analysis, the verdict awarded Ms. Branch cannot be deemed excessive.

Finally, defendants allege that they are entitled to a reduction of the verdict pursuant to the Pennsylvania Property and Casualty Insurance Guaranty Association Act. The Act's purposes include "[t]o provide a means for the payment of covered claims under certain property and casualty insurance policies, to avoid excessive delay in the payment of such claims and to avoid financial loss to claimants or policyholders as a result of the insolvency of an insurer."[23] The Act contains a "non-duplication of recovery" provision[24] which provides:

"(a) Any person having a claim under an insurance policy shall be required to exhaust first his right under such policy. For purposes of this section, a claim under an insurance policy shall include a claim under any kind of insurance whether it is a first-party, or third-party claim, and shall include, without limitation, accident and health insurance, workers' compensation, Blue Cross and Blue Shield and all other coverage except for policies of an insolvent insurer. Any amount payable on a covered

---

21. N.T. 8/9/00, at 373-76.

22. N.T. 8/10/00, at 582.

23. 40 P.S. §991.1801(l).

24. 40 P.S. §991.1817.

claim under this Act shall be reduced by the amount of any recovery under other insurance.

"(b) Any person having a claim which may be recovered under more than one insurance guaranty association or its equivalent shall exhaust first his right of recovery from the association of the place of residence of the insured. Any amount payable on a covered claim under this Act shall be reduced by the amount of recovery from any other insurance guaranty association or its equivalent." [25]

Thus, this statute prohibits recovering twice for the same loss, but it does not prohibit recovering from different insurers who cover different risks. Plaintiff cites *McCarthy v. Bainbridge*[26] for the proposition that the Act does not provide for an offset because it does not prohibit recovering from different insurers covering different risks. In *McCarthy,* the question presented was whether the non-duplication provision permits the association[27] to offset amounts received by a claimant under a life insurance policy against the amount the association would otherwise owe the claimant as a result of a settlement or a verdict. In *McCarthy,* plaintiff filed a medical malpractice suit on behalf of decedent's estate. Defendant's liability insurer, PIC Insurance Group Inc. was responsible for $200,000 of the negotiated settlement. PIC became insolvent, and did not pay its portion of the settlement. The association became responsible

---

25. 40 P.S. §991.1817.

26. *McCarthy v. Bainbridge,* 739 A.2d 200 (Pa. Super. 1999).

27. The association is the guarantor of monies owed a claimant by a medical malpractice insurer who is insolvent.

for all unpaid claims against PIC, and plaintiff's claim against PIC became a claim against the association. The association refused to make any payment pursuant to the settlement because the decedent had a life insurance policy providing a benefit of $584,216.84. The association argued that the "non-duplication of recovery provision" provided that the $200,000 claim against the association was entirely offset by the life insurance proceeds plaintiff received. The trial court held that the association was entitled to the offset. On appeal, the Superior Court overruled this finding and held the "non-duplication" provision did not entitle the association to an offset for life insurance benefit payments paid to plaintiff in the underlying medical malpractice action. The Superior Court held in order to determine what money from other insurance is offset:

"[T]here must be some relationship between the claim against [the association] and the claim under other insurance that must be offset. The only reasonable reading of the offset provision is to require that the claim to be offset must be for the same loss as the claim asserted against PIC. In other words, the claim must be under insurance that sought to protect the insured against the same risk as was covered by the now insolvent insurer for whom [the association] is providing coverage."[28]

The court went on to distinguish between life insurance, which "provides a defined benefit payable up to death, whether accidental or from natural causes, to designated beneficiaries" and medical malpractice liability casualty insurance, which "provides coverage for

28. *McCarthy* at 203.

amounts the insured is held legally liable to pay others because of the doctor's own negligence and the harm it caused."[29]

*McCarthy* clearly establishes that not all payments to insured can be used for an offset. However, it does not deal with the issue of whether a medical malpractice claim, which includes a claim for reasonable and customary value for reasonably necessary medical care as a result of medical malpractice, can be offset under the non-duplication provision by health insurance payments made to plaintiff.

This issue was recently decided by the Superior Court in *Panea v. Isdaner*.[30] In *Panea,* the Superior Court affirmed a trial court's holding that defendant was entitled to offset payments plaintiff received from workers' compensation. In *Panea,* the Superior Court reviewed three trial court decisions that dealt with the non-duplication provision. It is the review of the third case, *Baker v. Myers,*[31] which is relevant to this case. In *Baker,* the defendant, Dr. Myers was found liable to plaintiff, Mr. Baker, for $65,665.91 in damages as a result of the negligent performance of spinal fusion surgery. Dr. Myers' insurer, PIC, became insolvent, and the defense was assumed by the Pennsylvania Property and Casualty Insurance Guaranty Association. After verdict, Dr. Myers filed a post verdict motion, claiming he was entitled to an offset for other insurance benefits Mr. Baker received, including workers' compensation. The trial court offset

29. *Id.* at 203.

30. *Panea v. Isdaner,* 2001 WL 347831 (Pa. Super. 2001).

31. *Baker v. Myers,* 642 EDA 1999 (2001).

the verdict, thereby reducing it to zero. On appeal, Mr. Baker questioned whether PPCIGA was entitled to an offset for payments of "other insurance for damages resulting from the culpable conduct giving rise to liability on the part of the insured." [32]

On appeal, the *Panea* court concurred with the holding in *McCarthy,* "[t]o the extent it stands for the proposition that the loss must be attributable to culpable conduct of a third party and the 'other insurance' is paying the loss in its capacity of a secondary obligor." [33] *Panea* discussed the distinctions between primary and secondary liability. The court explained the distinction using subrogation law as an example. A tort-feasor is primarily liable, an insurer who pays a claim under a policy is secondarily liable. Under the right of subrogation, "[o]nce the insurer has paid a claim to the insured, it may then stand in the shoes of the insured and assert the insured's rights against the tort-feasor." [34]

Life insurance proceeds "represent the life insurance company's primary obligation under the contract." For this reason, a life insurance carrier does not have the right to subrogate. A third parties' negligence did not cause the life insurance carrier to make a payment, rather "it was solely obligated to pay due to the happening of an event (death), regardless of fault." Thus, "it cannot be said that the failure to offset where the payment consists of life insurance proceeds results in a duplicative recov-

---

32. *Panea* at 9.

33. *Id.* at 9.

34. *Id.* at 10, citing *Daley-Sand v. West American Insurance Co.,* 387 Pa. Super. 630, 564 A.2d 925 (1989).

ery."[35] The court distinguished between life insurance and workers' compensation insurance. Life insurance pays a benefit which represent the life insurance companies' "primary obligation under [its] contract."[36] In contrast, "when an employer seeks subrogation under the Workers' Compensation Act, or for that matter a health insurance carrier, recovery is dependant upon establishing that it was caused to make its payments due to the negligence of a third party."[37]

Citing the trial judge's opinion, the court noted, "it is without dispute that [Mr. Baker] received insurance benefits both under [workers'] compensation and for certain surgeries which far exceeded the amount of judgement entered in this case . . . ."[38] Further, Mr. Baker's injuries were the result of "defendant's tortious conduct."[39] Thus, "the trial court did not err in molding the verdict to zero in light of the fact the other insurance payments were made for medical expenses incurred as a result of defendants' culpable conduct."[40]

Likewise herein, the defendant would be entitled to an offset for any amounts actually paid on behalf of Ms. Branch by her health insurance. Ms. Branch concedes that she received some benefits for medical treatment made necessary by Dr. Ledesma's negligence.[41] Likewise

---

35. *Id.* at 10.

36. *Id.* at 10.

37. *Id.* at 10.

38. *Id.* at 10.

39. *Id.* at 10.

40. *Id.* at 10.

41. Plaintiff's brief in opposition to defendants' motion for post-trial relief, at footnote 1.

the amount of Ms. Branch's verdict, included an amount attributable to her medical expenses. It is clear however, that some medical care would have been needed to treat the underlying medical condition even if Dr. Ledesma had properly cared for his patient. Thus, Dr. Ledesma is entitled to an offset from his liability for any medical expenses paid by Ms. Branch's health insurance which would not otherwise been needed.

There is, however, no evidence upon which to base this offset. Defendants' motion for post-trial relief requests an offset $68,237.63.[42] However, this figure is not supported by any evidence that plaintiff received $68,237.63 in insurance benefits or that this was due to negligence. Without evidence of the amount of insurance benefits received, defendants' liability cannot be offset. Defendants' request for remittitur was properly denied.

For the forgoing reasons, this court properly denied defendants' post verdict motion.

---

42. Defendant's motion for post-trial relief.