Lynda CARROZZA, Appellee

v.

Roy GREENBAUM, M.D., Radiology Affiliates of Central New Jersey, P.A. St. Agnes Medical Center, Kathryn A. Evers and Hahnemann University Hospitals, East, Allegheny University of the Health Sciences d/b/a, Allegheny University Imaging Services, Hahnemann University Hospital, MIIX Insurance Company and Pennsylvania Property and Casualty Insurance Guaranty Association

Appeal of: Allegheny University Hospitals East and Allegheny University of the Health Sciences d/b/a Allegheny University Imaging Services

Lynda Carrozza, Appellee

v.

Roy Greenbaum, M.D., St. Agnes Medical Center, Kathryn A. Evers, M.D., Hahnemann University Imaging Services and Radiology Affiliates of Central New Jersey, P.A. and MIIX Insurance Company, and Pennsylvania Property and Casualty Insurance Guaranty Association

Appeal of: MIIX Insurance Company

Lynda Carrozza, Appellee

v.

Roy Greenbaum, M.D., Radiology Affiliates of Central New Jersey, P.A., St. Agnes Medical Center, Kathryn A. Evers M.D., Allegheny University Hospitals East, Allegheny University of the Health Sciences d/b/a Allegheny University Imaging Services and Hahnemann University Hospital, MIIX Insurance Company, Pennsylvania Property and Casualty Insurance Guaranty Association

Appeal of: Kathryn A. Evers, M.D. & Hahnemann University Hospital

Lynda Carrozza, Appellee

v.

Roy Greenbaum, M.D., Radiology Affiliates of Central New Jersey, P.A., St. Agnes Medical Center, Kathryn A. Evers M.D., Allegheny University of the Health Sciences d/b/a Allegheny University Imaging Services, Hahnemann University Hospital, MIIX Insurance Company and Pennsylvania Property and Casualty Insurance Guaranty Association

Appeal of: Roy Greenbaum, M.D. and Radiology Affiliates of Central New Jersey, P.A.

Superior Court of Pennsylvania.

Argued Feb. 3, 2004.

Filed Dec. 8, 2004.

Reargument Denied Feb. 11, 2005.

Randy A. Mariano, Philadelphia, for Allegheny University Hospital.

Sara A. Frey, Philadelphia, for MIIX Insurance.

Paul E. Peel, Plymouth Meeting, for Evers and Hahnemann University Hospital.

James F. Gallo, Philadelphia, for Greenbaum and Radiology Affiliates.

Ronald L. Wolf, Phiadelphia, for Carrozza.

Lise Luborsky, Philadelphia, for Pennsylvania Property and Casualty.

Ann Cairns, Philadelphia, for St. Agnes Hospital.

Scott Kramer, Amicus Curaie, for Hospital Assoc. of Pa.

Before: KLEIN, McCAFFERY, and OLSZEWSKI, JJ.

OPINION BY McCAFFERY, J.:

¶ 1 In this consolidated appeal, we are asked to determine whether the trial court erred in denying motions for post-trial relief in the form of a judgment *non obstante verdicto* or, in the alternative, a new trial and remittitur. Specifically, we must decide whether Appellee, Lynda Carrozza, presented sufficient expert testimony to prove negligence and causation in a medical malpractice action. In addition, we are asked to consider whether the trial court properly resolved satisfaction of the ultimate judgment. Specifically, we must determine whether a finding of joint and several liability against all defendants obviates the obligation of the Pennsylvania Property and Casualty Insurance Guaranty Association ("PPCIGA") where one defendant has sufficient insurance coverage to pay the entire amount of the verdict. After very careful review, we hold that the experts' testimony was sufficiently definitive to meet Appellee's burden of proof as to both breach of the requisite standard of care and causation of harm. Furthermore, we hold that the non-duplication provision of 40 P.S. § 991.1817 is not applicable to the instant case. Accordingly, we affirm in part, reverse in part, and remand this matter for proceedings consistent with this opinion.

¶ 2 The salient facts and procedural history underlying this case are as follows.[1] In February 1996, at the age of 36, Lynda Carrozza underwent a baseline screening mammogram at St. Agnes Medical Center.[2] The resulting five (5) x-ray films were reviewed and interpreted by radiologist Roy Greenbaum, M.D. Dr. Greenbaum examined two (2) views of each breast plus one magnification view of an area of calcifications in the right breast. Although he observed and reported on the calcifications, Dr. Greenbaum concluded that the calcifications were probably benign and recommended that Carrozza return for a routine mammogram in two (2) years.[3]

---

1. Except where noted, the facts are summarized from the trial court opinion dated June 13, 2003.

2. Carrozza had a family history of breast cancer, including a grandmother who died as a result of the disease. Dr. Greenbaum was aware of this history at the time of Carrozza's first mammogram. (Greenbaum Trial Testimony, 1/17/03, at 422–424; R.R. at 473–75). In addition to a prior diagnosis of fibrocystic breast disease, Carrozza explained that family history was a motivating factor in obtaining the baseline mammogram at such a young age. (Carrozza Trial Testimony, 1/15/03, at 330–331; R.R. at 381–382).

3. Dr. Greenbaum's report to the referring physician describing the cluster of calcifications in the right breast stated, *inter alia*, "This does not have a particularly suspicious appearance to it." (Greenbaum Trial Testimony at 428; R.R. at 191, 479). Dr. Greenbaum also stated, "[u]nfortunately, a small lesion could be obscured in these dense breasts." (Greenbaum Trial Testimony at 429; R.R. at 480).

¶ 3 In May 1998, Carrozza underwent another screening mammogram, this time at Hahnemann University Hospital, which was then part of the Allegheny University health system. The resulting films were reviewed and interpreted by radiologist Kathryn Evers, M.D. Dr. Evers compared the 1998 set of films with those taken in 1996, noted no change in the calcifications which had been seen in Carrozza's right breast, and concluded that the calcifications were benign. Dr. Evers recommended that Carrozza return in one (1) year for a mammogram. In May 1999, a third radiologist[4] reviewed a third series of films and concluded the calcifications in Carrozza's right breast were benign.

¶ 4 In August 1999, Carrozza noticed a lump in her right armpit. A few weeks later, she noticed a mass in her right breast. (Carrozza Trial Testimony ("T.T."), 1/15/03, at 336–337; R.R. at 387–388). On September 24, 1999, an oncologist examined Carrozza's right breast, noting a mass measuring 9x10 centimeters, a 4 centimeter lymph node, and bloody discharge from the nipple. (N.T. Deposition of Rene R. Rubin, M.D., 12/27/01, at 11; R.R. at 1029). A surgical oncologist subsequently performed needle biopsies in three (3) separate locations in Carrozza's right breast, and all three tested positive for carcinoma. (N.T. Deposition of Lori Jardines, M.D., 1/22/02, at 20–21; R.R. at 1000–01). Beginning in September 1999 and continuing through the spring of 2000, Carrozza underwent eight (8) cycles of aggressive chemotherapy in addition to a radical mastectomy,[5] a series of reconstructive procedures, including reduction of her healthy breast, and radiation therapy, which resulted in radiation burns.

■ ¶ 5 Carrozza filed a malpractice complaint alleging negligence on the part of doctors Greenbaum and Evers and their practices and associated hospitals in June 2000. In February 2002, PHICO Insurance, the company insuring Dr. Evers and her group, declared bankruptcy. Thereafter, PPCIGA[6] assumed responsibility for the defense of Dr. Evers and her group.

¶ 6 The Honorable Joseph I. Papalini presided over the seven (7) day trial at which Carrozza offered the testimony of two experts in support of her malpractice claim—John G. Pearce, M.D.[7] on the breach of the standard of care and Paul M.

---

4. This radiologist, Dr. Geraldine Hamilton, is not a party to this action nor did any party call her to testify at trial.

5. Tissue analysis revealed seven (7) lymph nodes which were also positive for inflammatory breast cancer.

6. PPCIGA is an agency created by the Pennsylvania legislature to provide limited statutory benefits when there is a covered claim arising under the insurance policy of an insolvent insurer, in this case, PHICO. *See* 40 P.S. §§ 991.1801—991.1820. When an insurer becomes insolvent, PPICGA becomes a "guarantor" with a limit of liability of $300,000 per claimant for covered claims. *See id. See also, Brostoski v. Lucchino*, 835 A.2d 751, 752 n. 2 (Pa.Super.2003); *McCarthy v. Bainbridge*, 739 A.2d 200, 201 (Pa.Super.1999), *aff'd*, 565 Pa. 464, 774 A.2d 1246 (2001).

7. Dr. Pearce testified that he is a diagnostic radiologist employed as the Director of Breast Imaging at the Morgan Cancer Center of Lehigh Valley Hospital. (Pearce T.T. 1/14/03, at 70–74; R.R. at 121–25). Dr. Pearce graduated from medical school in New Zealand and then trained for four years at the University of Toronto as a diagnostic radiologist. *Id.* Dr. Pearce is board certified as a diagnostic radiologist. He was appointed as Assistant Professor of Radiology at both the University of California in Irvine and the University of Southern California in Los Angeles, where he eventually became a full professor. *Id.* He was appointed Chief of Diagnostic Radiology and eventually Chief of Mammography at USC before moving to Allentown, Pennsylvania. *Id.*

Goldfarb, M.D.[8] on causation. Carrozza presented evidence to show that the misreading and misinterpretation of the mammograms she had undergone in 1996 and 1998 and the resulting failure to recommend biopsy[9], led to the delay in diagnosis, which in turn necessitated more invasive surgery, a more aggressive course of treatment and a significantly reduced life expectancy.[10] Following a day and a half of deliberations, on January 24, 2003, the jury returned a verdict in favor of Carrozza and against the defendant doctors in the amount of $4 million. The jury apportioned liability at fifty percent (50%) to Dr. Greenbaum and fifty percent (50%) to Dr. Evers. Judge Papalini molded the verdict to include the respective practice groups and corporate entities for these physicians on the basis of vicarious liability.[11] Judge Papalini entered the verdict as $2,000,000 against each of the two groups, jointly and severally within each group. The defen-

dants filed post-trial motions seeking entry of judgment n.o.v. or a new trial, remittitur and allocation of responsibility between the entities involved for coverage: MIIX Insurance Company ("MIIX") for Greenbaum and PPCIGA for Evers. MIIX and PPCIGA filed Petitions to Intervene, which the trial court granted.

¶ 7 Following argument on the motions on May 28, 2003, Judge Papalini denied the defendants' request for judgment n.o.v. or a new trial and denied remittitur. In his order and opinion dated June 13, 2003, the judge granted Carrozza's motion for delay damages in the amount of $482,000, and again molded the verdict to find joint and several liability on behalf of all defendants together, rather than within the two separate groups. Judge Papalini also concluded that MIIX alone was responsible for the entire amount of the verdict, that MIIX's policy limits were sufficient to set

---

**8.** Dr. Goldfarb testified that he is a surgical oncologist who has been in private practice in San Diego, California, since 1980. (Goldfarb T.T., 1/15/2003, at 237–38; R.R. at 289–90). Dr. Goldfarb graduated from medical school in Buffalo, New York, spent two years at Cook County Hospital in Chicago, two years with the Navy and received surgical training at Albert Einstein College of Medicine in New York City. *Id.* Dr. Goldfarb is board certified in general surgery and also received special training in cancer surgery at Memorial Sloane Kettering in New York and one year of training in London at the Royal Marsden Hospital. *Id.* He holds a full clinical professorship at the University of California, San Diego and is on the teaching faculty at the San Diego Navy Hospital. *Id.*

**9.** Dr. Pearce testified at length, explaining the formation of calcifications, the different classifications, the radiologist's role and the tools available to him or her. For example, Dr. Pearce testified that calcifications are either clearly benign, clearly malignant, or indeterminate, which is somewhere in between. (Pearce T.T. at 102–03; R.R. at 153–54). Dr. Pearce opined that Greenbaum misinterpreted the bilateral mammogram taken in Febru-

ary 1996 in that the cluster of calcifications seen in the upper outer quadrant of the right breast should have been characterized as indeterminate, requiring biopsy, because the possibility of ductal carcinoma *in situ* ("DCIS") could not be excluded on the basis of the 1996 mammographic findings. In other words, the suspicious calcifications required biopsy. (*Id.* at 118–121; R.R. at 169–172). Dr. Pearce also opined that Dr. Evers misinterpreted the mammogram taken in May 1998 in that the cluster should have been interpreted as showing a changing morphology of indeterminate calcifications in the right upper outer quadrant suggestive of DCIS, and a biopsy should have been recommended. (*Id.* at 121–125; R.R. at 172–176). Dr. Pearce's testimony is reproduced, in pertinent part, in Appendix A.

**10.** Dr. Goldfarb explained the mechanics and process of the disease, the options for treatment, and life expectancy. Goldfarb's testimony is also reproduced, in relevant part, in Appendix B.

**11.** The issue of vicarious liability is not on appeal.

off and obviate all obligations of PPCIGA, and that MIIX would also be required to recover any amount payable in contribution from the MCARE Fund.[12] These timely appeals followed.

¶ 8 At docket number 2665 EDA 2003, Dr. Greenbaum raises three issues for our review, which he frames as follows:

1. WHERE, IN A MEDICAL MALPRACTICE CASE, THE EVIDENCE IS THAT THREE PHYSICIANS (RADIOLOGISTS) REVIEWING THREE SEPARATE SERIAL MAMMOGRAMS OVER A THREE YEAR PERIOD INTERPRETED CALCIFICATIONS IN PLAINTIFF'S RIGHT BREAST AS BENIGN, IS A JURY FINDING OF NEGLIGENCE AGAINST THE WEIGHT OF THE EVIDENCE, WARRANTING THE ENTRY OF JNOV OR, AT THE LEAST, A NEW TRIAL, WHERE THE ONLY EVIDENCE AGAINST ONE OF THOSE PHYSICIANS IS THE OPINION TESTIMONY OF ONE EXPERT SIMPLY THAT HE DISAGREES WITH HIS DIAGNOSTIC INTERPRETATION?

2. IS THE EVIDENCE INSUFFICIENT AS A MATTER OF LAW TO SUPPORT A VERDICT OF MEDICAL NEGLIGENCE AGAINST A PHYSICIAN, WHERE THE ONLY CRITICISM IS PLAINTIFF'S EXPERT'S DIFFERENT OPINION ON THE DIAGNOSTIC SIGNIFICANCE OF MAMMOGRAM CALCIFICATIONS SEEN AND REPORTED ON BY BOTH THE DEFENDANT AND THE EXPERT, BUT WITH NO OTHER CLAIMED BREACH OF STANDARD OF CARE BY THE DEFENDANT PHYSICIAN, AS TO HIS TECHNICAL METHODOLOGY, CRITERIA FOR INTERPRETATION/DIAGNOSIS, SENSITIVITY LEVEL, I.E., THRESHOLD OF SUSPICION, OR ANYTHING ELSE AT ALL?

3. IS THE $4 MILLION VERDICT EXCESSIVE, REQUIRING REMITTITUR?

(Dr. Greenbaum's Brief at 4).

¶ 9 At docket number 2372 EDA 2003, Dr. Evers sets forth the following three claims for our review:

1. WHETHER THE TRIAL COURT ERRED IN DENYING APPELLANTS' MOTION FOR JUDGMENT NOTWITHSTANDING THE VERDICT DUE TO PLAINTIFF'S FAILURE TO PRESENT SUFFICIENT MEDICAL EXPERT TESTIMONY TO MEET HER BURDEN OF PROVING THAT DR. EVERS' ALLEGED NEGLIGENCE PROXIMATELY CAUSED PLAINTIFF'S INJURIES?

2. WHETHER THE TRIAL COURT ERRED IN DENYING APPELLANTS' POST–TRIAL MOTION FOR REMITTITUR OR, IN THE ALTERNATIVE, A NEW TRIAL ON THE GROUNDS THAT THE JURY'S VERDICT WAS CLEARLY EXCESSIVE AND AGAINST THE WEIGHT OF THE EVIDENCE PRESENTED AND COULD ONLY HAVE BEEN THE PRODUCT OF PREJUDICE, SYMPATHY, SPECULATION AND CONJECTURE?

3. WHETHER THE TRIAL COURT ERRED IN CONCLUDING THAT THE AMOUNT OF THE JUDGMENT WHICH MIIX INSURANCE COMPANY COULD POTENTIALLY RECOVER AS CONTRIBUTION FROM THE

12. The Medical Care Availability and Reduction of Error Act, 40 P.S. § 1303.101 et seq., is the enabling legislation for the MCARE Fund, which replaced the Medical Professional Liability Catastrophe Loss Fund (CAT Fund) effective March 20, 2002.

MEDICAL CARE AVAILABILITY AND REDUCTION OF ERROR (MCARE) FUND IS $1,800,000.00?

(Dr. Evers' Brief at 4).

¶ 10 At docket number 2296 EDA 2003, Allegheny University Hospital ("Allegheny") raises the following three issues on appeal:

1. WHETHER PLAINTIFF FAILED TO PRESENT SUFFICIENT EVIDENCE TO DEMONSTRATE A PRIMA FACIE CASE OF MEDICAL NEGLIGENCE, SPECIFICALLY CAUSATION, UNDER APPLICABLE STANDARDS OF PROOF FOR A MEDICAL MALPRACTICE ACTION AGAINST APPELLANTS?

2. WHETHER THE VERDICT WAS AGAINST THE WEIGHT [OF] THE EVIDENCE BECAUSE THREE RADIOLOGISTS AT THE TIME OF TREATMENT READ MAMMOGRAMS THE SAME WAY AND THE PLAINTIFF'S EXPERT CONCEDED THAT A MISTAKE IN JUDGMENT IS NOT NEGLIGENCE, AND THE JURY WAS CHARGED LIKEWISE THAT THE LAW OF THE COMMONWEALTH IS THAT AN ERROR OF JUDGMENT IS NOT NEGLIGENCE?

3. WHETHER THE AMOUNT OF THE JURY'S VERDICT WAS CLEARLY EXCESSIVE AND AGAINST THE WEIGHT OF THE EVIDENCE PRESENTED AND COULD ONLY HAVE BEEN THE PRODUCT OF PREJUDICE, SYMPATHY, SPECULATION AND CONJECTURE?

(Allegheny's Brief at 4).

¶ 11 And finally, at docket number 2371 EDA 2003, MIIX presents the following question for our review:

DOES THE PENNSYLVANIA PROPERTY AND CASUALTY INSURANCE GUARANTY ASSOCIATION (PPCIGA) ACT REQUIRE PLAINTIFF TO EXHAUST HER CLAIMS AGAINST MIIX INSURANCE COMPANY, THE SOLVENT INSURER OF THE CO–DEFENDANTS HELD TO BE JOINT TORTFEASORS, THEREBY RELIEVING PPCIGA FROM ANY OBLIGATION TO MAKE PAYMENT IN SATISFACTION OF THE JUDGMENT, EVEN THOUGH ITS "INSUREDS" WERE FOUND 50 PERCENT LIABLE?

(MIIX's Brief at 4).

¶ 12 Appellants Greenbaum, Evers and Allegheny first contend that the trial court erred in denying their motions for judgment n.o.v. because the evidence was insufficient to support the jury's verdict.[13] Specifically, they challenge the sufficiency of the expert testimony on the alleged deviation from the standard of care as well as on causation. Appellants assert that Dr. Pearce's testimony supports a finding only of a mere error of judgment and that a physician cannot be held liable for a mere error of judgment.[14] They also com-

---

13. (Greenbaum's Brief at 13–22, Ever's Brief at 12–16, Allegheny's Brief at 10–15). For ease of disposition, we have combined Appellants' issues where appropriate.

14. We note that the trial court instructed the jury that a mere mistake or error of judgment is not negligence. (N.T. Trial, 1/22/03, at 756–57; R.R. at 807–08). Although it is a legal axiom that a physician will not be held liable for a "mere error of judgment", this is not to say that he or she cannot be found liable for a mistake of judgment or misdiagnosis. *Havasy v. Resnick*, 415 Pa.Super. 480, 609 A.2d 1326, 1336 (1992). "He is clearly liable if his mistake reflects a failure to follow proper practice and thereby violates the standard of care required of physicians." *Id. See Corrado v. Thomas Jefferson University Hospital*, 790 A.2d 1022 (Pa.Super.2001) (granting the plaintiff a new trial against the hospital on the plaintiff's claim that the radiologist's read-

plain that Dr. Goldfarb's testimony did not satisfy Carrozza's burden on causation, and consequently, the trial court erred in refusing to enter judgment n.o.v. We disagree.

¶ 13 When examining the propriety of a trial court's decision to deny judgment n.o.v., we must determine whether there is sufficient competent evidence to sustain the verdict. *Kennedy v. Sell*, 816 A.2d 1153, 1156 (Pa.Super.2003) (citation omitted); *Haddad v. Gopal*, 787 A.2d 975, 979 (Pa.Super.2001), *appeal denied*, 572 Pa. 705, 813 A.2d 842 (2002) (quotation omitted). We will review all of the evidence in the light most favorable to the verdict-winner and will give that party the benefit of every reasonable inference arising from that evidence while rejecting all unfavorable testimony and inferences. *Birth Center v. St. Paul Companies, Inc.*, 567 Pa. 386, 397, 787 A.2d 376, 383 (2001) (citation omitted); *Haddad, supra.* Judgment n.o.v. may be entered where: (1) the moving party is entitled to judgment as a matter of law and/or (2) the evidence is such that no two reasonable minds could disagree that the verdict should have been rendered for the moving party. *Haddad, supra.* Our scope of review is plenary concerning any questions of law. *Id.* Regarding questions of credibility and the weight accorded the evidence at trial, however, we will not substitute our judgment for that of the fact-finder. *Id.* Judgment n.o.v. should be entered only in a clear case, and "any doubts must be resolved in favor of the verdict winner." *Birth Center, supra; accord Haddad, supra.*

¶ 14 To establish a *prima facie* case of medical malpractice, the plaintiff must prove that 1) the medical practitioner owed a duty to the plaintiff; 2) the practitioner breached that duty; 3) the breach was the proximate cause of, or a substantial factor in, bringing about the harm the plaintiff suffered; and 4) the damages suffered were the direct result of the harm. *Montgomery v. South Philadelphia Medical Group*, 441 Pa.Super. 146, 656 A.2d 1385, 1390 (1995) (citing *Mitzelfelt v. Kamrin*, 526 Pa. 54, 62, 584 A.2d 888, 891 (1990)). If the circumstances surrounding a claim of malpractice are beyond the knowledge of the average lay person, the plaintiff must present an expert to testify that the conduct of the practitioner deviated from "good and acceptable medical standards, and that such deviation was a substantial factor in causing the harm suffered." *Id.* (citations omitted).

> To be admissible, the opinion of an expert witness must be rendered within a reasonable degree of medical certainty. Whether an expert's opinion is reasonably certain must be decided after considering the expert's testimony in its entirety. That an expert may have used less definite language does not render his entire opinion speculative if at some time during his testimony he expressed his opinion with reasonable certainty.

*Id.* (internal citations omitted). *See also Smith v. Grab*, 705 A.2d 894, 900 (Pa.Super.1997) (reiterating that we do not require experts to use "the magic words" when testifying, instead "we look to the substance of the testimony").

¶ 15 The focus of our inquiry in the case *sub judice* is whether Carrozza's experts offered opinions within a reasonable degree of medical certainty that Ap-

---

ing and interpretation of CT scan films deviated from the standard of care where radiologist's report indicated no cancer cells were present). Here, it is undisputed that Dr. Greenbaum's and Dr. Evers' duty to Carrozza was to read and interpret the films and to make recommendations based upon their interpretation. (*See* Trial Court's charge and reading of the verdict sheet, N.T. Trial, 1/22/03, at 747–48; R.R. at 798–99).

pellants' conduct breached the standard of care for radiologists and increased the risk of harm to Carrozza. Contrary to Appellants' assertion, Carrozza was not required to establish that Appellants' negligence was the actual "but for" cause of her injuries. *See Jones v. Montefiore Hospital,* 494 Pa. 410, 415, 431 A.2d 920, 923 (1981); *Hamil v. Bashline,* 481 Pa. 256, 392 A.2d 1280 (1978).

¶ 16 In *Hamil,* our Supreme Court adopted the relaxed "increased-risk-of-harm" standard for use in certain medical malpractice claims. *Id.* at 271, 392 A.2d at 1288.[15] In adopting this principle, the *Hamil* Court reasoned:

> In light of our interpretation of Section 323(a), it follows that where medical causation is a factor in a case coming within that Section, it is not necessary that the plaintiff introduce medical evidence in addition to that already adduced to prove defendant's conduct increased the risk of harm—to establish that the negligence asserted resulted in plaintiff's injury. Rather, once the jury is apprised of the likelihood that defendant's conduct resulted in plaintiff's harm, that Section leaves to the jury, and not the medical expert, the task of balancing probabilities.

*Hamil,* 481 Pa. at 273, 392 A.2d at 1288. Subsequently, our high court explained:

> An example of this type of case is a failure of a physician to timely diagnose breast cancer. Although timely detection of breast cancer may well reduce the likelihood that the patient will have a terminal result, even with timely detec-

tion and optimal treatment, a certain percentage of patients unfortunately will succumb to the disease. This statistical factor, however, does not preclude a plaintiff from prevailing in a lawsuit. Rather, once there is testimony that there was a failure to detect the cancer in a timely fashion, and such failure increased the risk that the woman would have either a shortened life expectancy or suffered harm, then it is a question for the jury whether they believe, by a preponderance of the evidence, that the acts or omissions of the physician were a substantial factor in bringing about the harm. *See, Jones v. Montefiore Hospital,* 494 Pa. 410, 431 A.2d 920 (1981).

*Mitzelfelt,* 526 Pa. at 62–63, 584 A.2d at 892 (emphasis added). *See also Smith v. Grab, supra* at 899 (stating expert's testimony demonstrating increased risk of harm "furnishes a basis for the fact-finder to go further and find that such increased risk of harm was in turn a substantial factor in bringing about the resultant harm") (quoting *Hamil, supra* ).

¶ 17 Accordingly, in cases where the plaintiff has introduced sufficient evidence that the defendant's conduct increased the risk of injury, the defendant will not avoid liability merely because the plaintiff's medical expert was unable to testify with certainty that the defendant's conduct *caused* the actual harm. *Montgomery,* 656 A.2d at 1392 (citing *Mitzelfelt, supra* ). The trial court may send the issue of causation to the jury "upon a less than normal threshold of proof" as long as

---

**15.** The applicable standard is defined in the Restatement as follows:

> Negligent Performance of Undertaking to Render Services
> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or

things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if
> (a) his failure to exercise such care increases the risk of such harm . . .

RESTATEMENT (SECOND) OF TORTS § 323(a) (1965).

reasonable minds could conclude that a preponderance of the evidence shows the defendant's conduct was a *substantial factor in causing* the resulting harm. *Id.* The determination then rests with the jury. *Mitzelfelt, supra; Montgomery, supra* at 1391 (citing *Jones supra* ).

¶ 18 Here, Carrozza's expert on the standard of care, Dr. Pearce, testified that the interpretations and recommendations of doctors Greenbaum and Evers deviated from the standard for radiologists. Dr. Pearce testified in detail as to what were, in his opinion, the appropriate interpretations and recommendations which should have been given to Carrozza's doctor in light of the radiographic features on her mammograms. (*See* n. 9, *supra* and Appendix A).

¶ 19 On the element of causation, Carrozza's expert Dr. Goldfarb testified, *inter alia*, as follows:

Q: Do you have an opinion, within a reasonable degree of medical certainty, as to whether a biopsy performed in 1996 would have shown either cancer or a precancerous lesion?

A: Yes.

Q: And what is your opinion?

A: I think my opinion is that more likely than not, if we had done a biopsy of the area of the calcifications in '96, we would have found either carcinoma in situ or a frank cancer at that time, a true cancer at that time.

\* \* \* \* \* \*

So my opinion then as a surgical oncologist is to a reasonable degree of probability, [in 1996] there was carcinoma in situ. More likely than not, it was in the same area of the breast where it was discovered [in 1999], and a biopsy later directed that [sic] the calcifications I think would have found carcinoma in situ.

Q: That is your opinion within a reasonable degree of medical certainty?

A: Yes.

\* \* \* \* \* \*

Q: If a recommendation had been made for a biopsy and if a biopsy had been taken in 1998 or shortly after that mammogram was done in May of 1998, do you have an opinion, within a reasonable degree of medical certainty, as to whether that biopsy would have shown some, either a DCIS, or a—the beginnings of an invasive cancer?

A: Yes.

Q: What is your opinion?

A: Again, I feel that either of those lesions would have been found at that time if they looked for it.

(Goldfarb T.T., 1/15/03, at 258–59, R.R. at 310–311).

¶ 20 After careful review of the record and the applicable law we opine that there were sufficient facts for the jury to have concluded that Appellants' conduct deviated from the standard of care and increased the risk of harm. Dr. Pearce's and Dr. Goldfarb's testimony in its entirety was sufficiently definitive to meet Carrozza's burden of proof as to both the breach of the standard of care and causation of harm. *See Montgomery*, 656 A.2d at 1392. We agree with the trial court's determination that this was not a clear case for judgment n.o.v., and conclude that the court properly denied Appellants' motion. *See Haddad*, 787 A.2d at 979. Moreover, we hold that there is sufficient competent evidence to sustain the jury's verdict. *See Kennedy*, 816 A.2d at 1156. Accordingly, Appellants' first contention merits no relief.

¶ 21 Appellants next assert that the trial court erred in denying their motion for a new trial because the jury's verdict was

against the weight of the evidence. Specifically, Appellants argue that the "uniform agreement among all three radiologists" who interpreted the films in real time outweighs Dr. Pearce's opinion in hindsight that the calcifications were not clearly benign, and in fact, were indeterminate and pleomorphic and mandated a recommendation to biopsy.[16] We cannot agree.

¶ 22 Our review of a ruling on a motion for a new trial is limited to determining whether the trial court abused its discretion or committed an error of law. *Vallone v. Creech,* 820 A.2d 760, 763 (Pa.Super.2003), *appeal denied,* 574 Pa. 755, 830 A.2d 976 (2003) (quotation and citation omitted); *Kennedy,* 816 A.2d at 1156 (citation omitted). We view the evidence in the light most favorable to the verdict-winner in making this determination, and we must consider whether a new trial would likely produce a different verdict. *Haddad,* 787 A.2d at 979 (quotation omitted). Consequently, if there is any support in the record for a trial court's decision to deny the motion, we must affirm. *Id.* The scope of review in determining whether the trial court erred in not granting a new trial is broader than when we review a denial of judgment n.o.v. *Id.* A new trial should be granted, however, only when the verdict is so contrary to the evidence as to shock one's sense of justice. *Id.* We will not reverse the trial court's refusal to grant a new trial unless the court committed a clear abuse of discretion or an error in law which controlled the outcome of the case. *Id.*

¶ 23 In this case, Appellants fail to point to and we do not find a clear abuse of discretion or an error of law which controlled the outcome of the case. We also note that Appellants did not call Dr. Hamilton, the third radiologist, to testify in discovery or at trial. Consequently, the jury was left to weigh the testimony of the two defendant doctors and their experts against Carrozza's witnesses and her experts. We will not invade the province of the jury, or the presiding judge, which patiently sat through seven days of testimony, saw and assessed the witnesses, heard and weighed the evidence, and deliberated for another day and a half. Consequently, Appellants' claim is unavailing.

¶ 24 Appellants Greenbaum, Evers and Allegheny also contend that the jury's verdict could only be the product of prejudice, sympathy, speculation and conjecture and the trial court erred in denying their motion for remittitur.[17] After a thorough review of the record, the briefs of the parties, the applicable law, and the well-reasoned opinion of Judge Papalini, we have determined that there is no merit to Appellants' claim for remittitur. Judge Papalini's opinion succinctly discusses and properly disposes of this issue as follows:

> The standard for granting a remittitur was set forth in *Tesauro v. Perrige,* 437 Pa.Super. 620, 650 A.2d 1079, 1081 (1994), *appeal denied,* 541 Pa. 627, 661 A.2d 874 (1995). The Superior Court said:
>
>> The decision to grant, or not to grant, a new trial based on the excessiveness of a jury verdict is within the sound discretion of the trial court, and its decision will be upheld on appeal absent a gross abuse of that discretion. *Botek v. Mine Safety Appliance Corp.,* 531 Pa. 160, 164–65, 611 A.2d 1174, 1176 (1992); *Harding v. Consolidated Rail Corp.,* 423 Pa.Super. 208, 224–26, 620 A.2d 1185, 1193 (1993). In this

---

**16.** (*See* Greenbaum's Brief at 11; Allegheny's Brief at 16).

**17.** (Greenbaum's Brief at 22–23, Evers' Brief at 16–22, Allegheny Brief at 18–23).

area of the law, a gross abuse of discretion means that the verdict must be so grossly excessive that it shocks the court's sense of justice.

*Id.* We are not free to substitute our judgment for that of the trial judge or jury. *Botek*, 531 Pa. at 164–65, 611 A.2d at 1176.

This Court has set out certain factors that are helpful in determining whether a particular verdict is excessive. A court should consider, *inter alia:*

> (1) the severity of the injury; (2) whether the injury is manifested by objective physical evidence or whether it is only revealed by the subjective testimony; (3) whether the injury is permanent; (4) whether the plaintiff can continue with his or her employment; (5) the size of out-of-pocket expenses; (6) the amount of compensation demanded in the original complaint.

*Harding*, 423 Pa.Super. at 225–26, 620 A.2d at 1193. The court should apply only those factors that are relevant in a particular case, as each case is unique. *Id.; Mineo v. Tancini*, 349 Pa.Super. 115, 124–26, 502 A.2d 1300, 1305 (1986).

Although the verdict of $4,000,000 was on the high side, given the extent of [Carrozza's] injuries, her pain and suffering and the significant reduction of her life expectancy attributed to the negligence of the Defendants, we cannot say that the amount of the verdict was unreasonable or so contrary to the evidence as to shock one's sense of justice and the award of a new trial is imperative so that right may be given another opportunity to prevail. For the same reasons, we conclude that a remittitur is not required.

(Trial Court Opinion, dated June 13, 2003, at 10–11).

¶ 25 The jury saw and heard competent and compelling evidence of injury, reduced life expectancy,[18] and pain and suffering. We conclude that the trial court was well within its purview in refusing to grant a new trial or remittitur for the reasons articulated in Judge Papalini's opinion. Accordingly, we affirm on the basis of the trial court's opinion as to Appellants' request for a new trial or remittitur.

¶ 26 The remaining issues on appeal concern the trial court's resolution of which entity was responsible for payment of the judgment. Intervenor MIIX argues the trial court erred in finding that MIIX's policy providing $5 million in coverage obviates PPCIGA's obligation to contribute any money in payment of the verdict. In addition, Dr. Evers argues that the trial court erred in apportioning $1,800,000 to the MCARE Fund as contribution towards the verdict when the issue had not been properly raised, briefed or argued before the court. (Evers' Brief at 22–23). We will address these claims *seriatim.*

¶ 27 As the insurer of Dr. Greenbaum, MIIX intervened in this case after the jury had reached its verdict to respond to a post-trial motion filed by Dr. Evers. The motion contended, in part, that Carrozza was required to exhaust Dr. Greenbaum's policy with MIIX before PPCIGA had any responsibility for payment of any portion of the verdict.[19] PPCIGA also intervened

---

**18.** *See Zieber v. Bogert*, 565 Pa. 376, 381, 773 A.2d 758, 761–762 (2001) (holding jury may consider evidence of increased risk and/or fear of recurrence of cancer in awarding damages).

**19.** When Dr. Evers' insurer was placed in liquidation, PPCIGA became obligated pursuant to its enabling statute to pay "covered claims" against Dr. Evers, subject to a $300,000 cap. *See* 40 P.S. § 991.1803.

384

in the case to argue that it was not required to make any contribution to the verdict regardless of Dr. Evers' independent negligence, because the MIIX policy limit exceeded the final judgment.

¶ 28 In its only issue on appeal, MIIX proffers that the trial court erred in concluding that Carrozza must first exhaust the MIIX policy limits before she could turn to PPCIGA for payment of the damages awarded against Dr. Evers by virtue of the jury verdict finding Dr. Evers fifty percent (50%) liable. MIIX reasons that the "Non-duplication of recovery" provision relied upon by PPCIGA is inapplicable here because Carrozza does not have any rights under the MIIX policy. (MIIX's Brief at 11–12). Citing this Court's decision in *Sands v. Pennsylvania Insurance Guaranty Association,* 283 Pa.Super. 217, 423 A.2d 1224 (1980), MIIX also posits that the Legislature did not intend that a solvent insurer should have to exhaust its policyholder's policy in payment of a joint tortfeasor's obligation for his or her independent negligence before seeking any recovery from PPCIGA. (*Id.* at 12–13).

¶ 29 PPCIGA counters that *Sands* is no longer the law of this Commonwealth. (PPCIGA's Brief at 10). Rather, PPCIGA contends, recent case law supports its position that the amended statute requires a solvent insurer, in this case MIIX, to pay out all available funds under its policy before the Act's statutory benefits become available. (*Id.* at 8–9). In addition, PPCIGA asserts that the Act was promulgated to protect claimants and policyholders, not insurers. (*Id.* at 7). Finally, PPCIGA insists that the clear language of the Act "subjects the insurers of joint tortfeasors to the very risk they chose when they issued their policies." (*Id.* at 6). Both PPCIGA and MIIX contend that Section 991.1817 [20] supplies the necessary authority for their respective positions.

■ ¶ 30 Our scope of review of the trial court's statutory construction is plenary, and our standard of review is limited to determining whether the court committed an error of law. *Panea v. Isdaner,* 773 A.2d 782, 788 (Pa.Super.2001) (*en banc*), *aff'd sub nom. Bell v. Slezak,* 571 Pa. 333, 812 A.2d 566 (2002) (citations omitted). We must give effect to all of a statute's provisions, each read in conjunction with the others, and we presume that the Legislature did not intend an absurd or unreasonable result. *Id.* (citation omitted); *McCarthy v. Bainbridge,* 739 A.2d 200, 202 (Pa.Super.1999), *aff'd,* 565 Pa. 464, 774 A.2d 1246 (2001) (citing 1 Pa. C.S.A. §§ 1921, 1922). Consequently, we are required to construe the non-duplication of recovery provision in a manner which produces a just and reasonable result. *McCarthy, supra.* Where the words of a statute are not explicit, "we are guided by rules of statutory construction to determine the intent of the General Assembly. As we have often observed, 'the object of all interpretation and construction of statutes is to ascertain and effectuate the intention of the General Assembly.' " *Milton S. Hershey Medical Center*

20. The provision provides:

§ 991.1817. Non-duplication of recovery

(a) Any person having a claim under an insurance policy shall be required to exhaust first his right under such policy. For purposes of this section, a claim under an insurance policy shall include a claim under any kind of insurance, whether it is a first-party or third-party claim, and shall include, without limitation, accident and health insurance, worker's compensation, Blue Cross and Blue Shield and all other coverages except for policies of an insolvent insurer. Any amount payable on a covered claim under this act shall be reduced by the amount of any recovery under other insurance.

40 P.S. § 991.1817(a).

*v. Commonwealth Medical Professional Liability Catastrophe Loss Fund*, 573 Pa. 74, 82, 821 A.2d 1205, 1210 (2003). In so doing, we are mindful that "the primary function of PPCIGA is to provide protection to claimants whose insurers have become insolvent." *McCarthy, supra.* Indeed, the purposes of this legislation have been set forth in the statute as follows:

(1) To provide a means for the payment of covered claims under certain property and casualty insurance policies, to avoid excessive delay in the payment of such claims and *to avoid financial loss to claimants or policyholders as a result of the insolvency of an insurer.*

(2) *To assist in the* detection and *prevention of insurer insolvencies.*

(3) To provide for the formulation and administration by the Pennsylvania Property and Casualty Insurance Guaranty Association of a plan of operation necessary to effectuate the provisions of this article.

40 P.S. § 991.1801 (emphasis added).

 ¶ 31 "The Act requires every insurer, as a condition of doing business in the Commonwealth, to participate in the Association." *Strickler v. Desai*, 571 Pa. 621, 628, 813 A.2d 650, 654 (2002) (citing 40 P.S. § 991.1803(a)). "In this manner, *the risk of loss* due to the insolvency of any one insurer *is spread out over all member insurance companies* and their policyhold-

ers. In effect, every time PPCIGA pays a claim, every member insurance company is paying part of the claim." *Panea*, 773 A.2d at 790 (citing 40 P.S. § 991.1810) (emphasis added). Therefore, "Section 991.1817 *aims to lessen the financial burden on the insurance industry, vis-à-vis* PPCIGA, by compelling a claimant to recover first from *their* insurers 'which are *contractually bound* to pay a claim.'" *Price v. Pennsylvania Property and Casualty Insurance Guaranty Association*, 795 A.2d 407, 410 (Pa.Super.2002), *appeal denied*, 573 Pa. 698, 825 A.2d 1262 (2003) (quoting *Panea, supra*) (emphasis added). *Accord Chow v. Rosen*, 571 Pa. 369, 373 812 A.2d 587, 589–90 (quoting *Bell, supra*). Thus, contrary to PPCIGA's position in this case, both the Act and interpretative case law evidences clear concern for the financial burden on insurance companies doing business in Pennsylvania.[21]

 ¶ 32 As suggested by the title, the non-duplication provision only prohibits recovering duplicatively, i.e. twice for the same loss. *McCarthy*, 739 A.2d at 203.[22] Turning to the specific language of the provision at issue, the first two sentences provide:

Any person having a *claim under an insurance policy* shall be required to exhaust first his *right under such policy.* For purposes of this section, a claim under an insurance policy shall include a

---

**21.** Approximately twenty-four (24) years ago in *Sands v. Pennsylvania Insurance Guaranty Association*, 283 Pa.Super. 217, 423 A.2d 1224 (1980), this Court noted studies conducted by legislatures, scholars, and industry associations which revealed the serious social harm that results when insurance companies become insolvent. *Id.* at 1225–26. As a result, the *Sands* Court explained that the National Association of Insurance Commissioners had drafted a model bill for states to adopt as an insurance guaranty act, which had in fact been adopted by that time, at least in part, by more than forty states. *Id.* To argue

that the financial welfare of solvent insurance companies was not then or is not now of concern to legislators and the courts is disingenuous at best. Ironically, the position maintained by PPCIGA here could conceivably result in the insolvency of additional insurers.

**22.** A logical extension of this statement is "it is not duplicative to recover twice when each recovery is for a different loss." *McCarthy, supra.*

claim under any kind of insurance, whether it is *a first-party or third-party claim*, and shall include, without limitation, accident and health insurance[23], worker's compensation[24], Blue Cross and Blue Shield[25] and all other *coverages* except for policies of an insolvent insurer.

40 P.S. § 991.1817(a) (emphasis added). When read together as they must be, we interpret these sentences to require that a claimant covered by a first-party or third-party insurance contract for the same injury for which the claimant is making a "covered claim"[26] under the PPCIGA Act must first exhaust all benefits available under that policy as provided by the insurance contract. The second sentence clarifies the previous sentence in the paragraph by providing a list of examples. Pennsylvania case law illustrates the types of insurance contracts set out in this list and the legislative intent behind the provision. *See, e.g., Bell, supra* (holding PPCIGA entitled to set off of health insurer's duplicative payment of patient's medical bills resulting from medical malpractice); *Price, supra* (affirming decision that PPCIGA was entitled to offset duplicative payments made by father's medical insurer

toward daughter's medical expenses resulting from doctors' malpractice); *Panea, supra* (concluding PPCIGA entitled to set-off for duplicative medical benefits paid by workers' compensation carrier for claimant's injury); *McMahon v. Caravan Refrigerated Cargo, Inc.,* 406 Pa.Super. 303, 594 A.2d 349 (1991) (holding under predecessor provision that PIGA was entitled to offset amount recovered from claimant's own automobile insurer for uninsured motorist benefits, but *not* for amount recovered by wife for loss of consortium claim).

¶ 33 The final sentence in this provision states: "Any amount payable on a covered claim under this act shall be reduced by the amount of any recovery under other insurance." 40 P.S. § 991.1817(a). By "other insurance", we conclude the drafters meant the other insurance referenced in the previous two sentences.[27]

¶ 34 In the only Pennsylvania case to consider the issue of joint tortfeasor insurance, PPCIGA's predecessor refused payment to a plaintiff who was seeking recovery under the uninsured motorist coverage with his own automobile insurer. *Sands, supra.* In that case, the plaintiff, Mr. Sands, was badly injured when a car driv-

---

**23.** Health insurance as contemplated in this section includes group health, sickness, or accident coverage provided to voluntarily-enrolled subscribers for a fixed, prepaid fee. *See generally,* 40 P.S. § 908–2. Other accident insurance as contemplated within this section includes the uninsured motorist provision of an insured's automobile insurance policy for which the insured has paid premiums. *See generally,* 40 P.S. § 2000.

**24.** Employers pay premiums for workers' compensation insurance to cover their employees in the event of accidental work-related injury. *See generally,* 77 P.S. § 501.

**25.** "Nonprofit hospital plans such as the one maintained and operated by Independence Blue Cross provide hospitalization and relat-

ed health benefits to plan subscribers for a fee." *Chow v. Rosen,* 571 Pa. 369, 371, 812 A.2d 587, 588 n. 1 (2002) (citing 40 P.S. § 6101).

**26.** In this case, the "covered claim" refers to Carrozza's claim against Dr. Evers. *See Bell, supra* at 343, 812 A.2d at 572. *See also,* 40 P.S. § 991.1802 (defining "covered claim").

**27.** We do not conclude here that an injured claimant *must first* apply for accident, health or disability benefits or file suit under an automobile policy or a homeowner's policy to recover damages before PPCIGA's obligation is triggered. As illustrated by the case law, however, PPCIGA is entitled to set off any recovery received under these insurance contracts where applicable.

en by a Mr. Davis in which Mr. Sands had been a passenger, collided with a car driven by a Mr. Patton, an uninsured motorist. Mr. Davis had liability and uninsured motorist coverage with Hawkeye Security Insurance Company. Hawkeye agreed to pay the $10,000 of uninsured motorist benefits in consideration for a release of all claims Mr. Sands may have had against Hawkeye. Mr. Sands then submitted a claim to his own insurer, Granite Mutual Insurance Company, for uninsured motorist benefits. When Granite refused to pay the claim, Mr. Sands filed a lawsuit and recovered a verdict for $10,000. In the meantime, Granite was declared insolvent.

¶ 35 When Mr. Sands applied to the Pennsylvania Insurance Guaranty Association ("PIGA") for payment, PIGA refused to pay, forcing Mr. Sands to file yet another lawsuit. *Id.* at 1225. PIGA argued that, under the former Act[28], Mr. Sands was first required to exhaust his claims against Hawkeye, the solvent insurer of a third-party tortfeasor, Mr. Davis. This Court rejected PIGA's position and held that Mr. Sands was not required to exhaust the liability coverage under the Hawkeye policy before PIGA was obligated to pay benefits. *Id.* at 1227. Of particular significance here is the Court's reasoning: "even if Davis was negligent, the most that could then be said would be that

Sands was 'a person having a claim against' Davis; he would not be a person having a claim against Davis's 'insurer,' Hawkey." *Id.*[29] Other courts have adopted this reasoning in cases deciding whether a claimant must exhaust a third-party joint tortfeasor's coverage before seeking payment from a guaranty association. *See, e.g., Medical Malpractice Joint Underwriting Assoc. of Rhode Island v. Rhode Island Insurers' Insolvency Fund*, 703 A.2d 1097, 1101 (R.I.1997) (holding Rhode Island's "nearly identical" statute requires same result); *Insurance Commissioner of Maryland v. Property and Casualty Insurance Guaranty Corporation*, 313 Md. 518, 546 A.2d 458, 461 (1988) (explaining right to recover contemplated by Maryland's similar statute is one which runs directly to the claimant under his own insurance policy and a legal right to recover damages from a negligent tortfeasor, which may ultimately be paid by the tortfeasor's insurer is not a "right" to which the statute refers).

¶ 36 Our high court continues to cite *Sands* for general propositions, negating any argument by PPCIGA that the decision is no longer good law. *See, e.g., Bell, supra* at 341, 812 A.2d at 570–571. Approximately fourteen (14) years after our holding in *Sands, supra*, the General

---

**28.** The predecessor non-duplication provision interpreted by the *Sands* Court stated:

Any person having a claim against an insurer under any provision in an insurance policy other than a policy of an insolvent insurer which is also a covered claim, shall first be required to exhaust his right under such a policy. Any amount payable on a covered claim under this act shall be reduced by the amount of any recovery under such insurance policy.

*Sands, supra* at 1226 (quoting 40 P.S. § 1701.503(a)).

**29.** Generally speaking, well-settled Pennsylvania law provides that an injured party may

not maintain a suit directly against the insurer to recover on a judgment rendered against the insured tortfeasor absent a statute or policy provision on which such a right may be predicated. *Bell, supra* at 345, 812 A.2d at 573 (quoting *Folmar v. Shaffer*, 232 Pa.Super. 22, 332 A.2d 821, 823 (1974)). Here, there is no question that Carrozza is a third-party claimant under Dr. Greenbaum's policy as well as a third-party claimant under Dr. Evers' policy. However, PPCIGA's contention that Carrozza's claim under Dr. Greenbaum's policy extinguishes PPCIGA's obligation under Dr. Evers' policy requires a leap of logic that we are unwilling to make.

Assembly amended the PIGA Act to its current form.[30] While the amended non-duplication provision now provides a clarifying list of the types of first-party and third-party insurance which must be exhausted, it makes no mention of joint tortfeasors, joint and several liability, insurance applicable to a different claim, or insurance held by another party to a lawsuit. *See* 40 P.S. § 991.1817(a), *supra.* In addition, there is nothing in the legislative history, nor is *Sands* referenced in the amended act itself, indicating that the Legislature did *not* intend to include a joint tortfeasor's insurance in the list of insurance which must first be exhausted before PPCIGA's obligation to pay is triggered.

¶ 37 Additionally, we conclude that a finding by a trial court of joint and several liability does not equate to the contractual obligation under an insurance policy as contemplated in the PPCIGA Act. Pursuant to the provisions of the Uniform Contribution Among Tort-feasors Act[31] applicable in this case[32], the trial court's finding of joint and several liability did not extinguish PPCIGA's obligation solely because Dr. Greenbaum had a policy with sufficient funds to cover the verdict. Indeed, as provided under Section 8325: "The recovery of a judgment by the injured person against one joint tortfeasor does not discharge the other joint tort-feasors." 42 Pa.C.S.A. § 8325. *See also Boggavarapu v. Ponist,* 518 Pa. 162, 165, 542 A.2d 516, 517 (1988) (stating "[a]s between the tort-feasors one may do more than the other and each must proportionally pay as the jury determines") (citations omitted). Consequently, Dr. Greenbaum, or any other judgment debtor, would be entitled to contribution from PPCIGA as the guarantor of funds on behalf of Dr. Evers in the same way he would be entitled to contribution from any other co-defendant.

¶ 38 Although the trial court acknowledged that there are no reported Pennsylvania cases requiring exhaustion of a joint tortfeasor's liability coverage, the court cites *Sutton v. Scheidt,* 141 Ohio App.3d 289, 750 N.E.2d 1184 (2001), *appeal denied,* 92 Ohio St.3d 1417, 748 N.E.2d 550 (2001) and *Vickers v. Howe,* 123 Ohio App.3d 456, 704 N.E.2d 344 (1998), *appeal dismissed,* 84 Ohio St.3d 1423, 702 N.E.2d 433 (1998), as persuasive. (Trial Court Opinion at 23–24). Upon review, however, we find that the Ohio statute that these cases interpret is easily distinguishable. Specifically, the Ohio statute provides: "Any person having a covered claim upon which recovery is also presently possible under an insurance policy written by another insurer shall be required first to exhaust his rights under such other policy." *Sutton, supra* at 1187 (citing R.C. 3955.13(A)). We conclude that the general language in the Ohio statute supports the Ohio courts' determinations in *Sutton, supra* and *Vickers, supra,* whereas the more specific language of § 991.1817 does not support the same result here.[33]

---

**30.** "The current version repealed and replaced the 1970 Act and became effective as of February 10, 1995." *Panea,* 773 A.2d at 790.

**31.** 42 Pa.C.S.A. §§ 8321–8327.

**32.** Instantly, we express no opinion on the effect of the enactment of the MCARE Payment of Damages provision, 40 P.S. § 1303.509, applicable to causes of action arising on or after March 20, 2002, or the amendments to the Comparative Negligence statute, 42 Pa.C.S.A. § 7102, applicable to causes of action accruing after August 18, 2002.

**33.** *See also Van Guilder v. National Freight, Inc.,* 686 N.W.2d 339 (Minn.Ct.App.2004) (interpreting general exhaustion provision amended in 1991, Minn.Stat. § 60C.13, subd.1, required solvent insurer of joint tortfeasor in automobile accident to exhaust its

¶ 39 In addition to the Ohio cases, PPCI-GA also relies on an unpublished district court case from Pottawattamie County, Iowa, in support of its assertion that a co-defendant's liability insurance coverage offsets PPCIGA's obligation. However, as PPCIGA concedes (PPCIGA's Brief at 12), the Iowa statute was drafted in more general terms.[34] Consequently, these cases do not support the conclusion PPCIGA urges us to reach here.

¶ 40 Our decision in the case *sub judice* is further buttressed by the reasoning set forth by our colleagues in *Brostoski v. Lucchino*, 835 A.2d 751 (Pa.Super.2003); *Fanning v. Davne*, 795 A.2d 388 (Pa.Super.2002), *appeal denied*, 573 Pa. 697, 825 A.2d 1261 (2003), and *McCarthy, supra.* In this line of cases, our Court has opined "that the only reasonable reading of the language of § 991.1817 was 'to require that the claim to be offset must be for the same loss as the claim asserted against the insolvent insurer.'" *Brostoski, supra* at 753 (citing *Fanning, supra* at 397). In *Brostoski*, we concluded that PPCIGA was not entitled to offset the settlement amount it was obligated to pay by the amount paid out through the plaintiff's health insurance where the claim for medical expenses had been withdrawn and the settlement was for pain and suffering. *Id.* Likewise, in *Fanning*, a panel of this Court concluded that PPCIGA was not entitled to an offset for the amount of lost wages and medical bills paid by the employer's workers' compensation carrier where the awarded damages were for pain and suffering, not lost

wages or medical bills. *Fanning, supra* at 397. Finally, our Court in *McCarthy* determined that PPCIGA's obligation on a medical malpractice policy was not obviated by proceeds paid from a life insurance policy where the medical malpractice policy and the life insurance policy insured against different risks and different losses. *McCarthy, supra* at 203.

¶ 41 Applying the reasoning set forth above, we note that the insurance at issue in this case is medical malpractice liability insurance. As we have previously observed, this type of insurance "provides coverage for amounts the insured (i.e., the doctor) is held legally liable to pay others because of *the doctor's own negligence* and the harm it caused." *Panea, supra* at 794 (quoting *McCarthy, supra* at 203) (emphasis added). Consequently, in this case we will not hold MIIX, Dr. Greenbaum's insurer, entirely responsible for paying the loss on behalf of Dr. Evers where that loss was occasioned by Dr. Evers' independent negligence. To require Carrozza to exhaust the MIIX policy for both losses before turning to PPCIGA would not be a fair and just result under the PPCIGA Act.

¶ 42 We note that the trial court's molding of the verdict to find joint and several liability on behalf of all defendants allows Carrozza the opportunity to seek payment from any one of the defendants, including Dr. Evers. Thus we conclude that PPCIGA should be liable to the same extent it would have been had the trial court not

---

coverage before funds could be recovered from the Minnesota Insurance Guaranty Association).

34. Specifically, the Iowa statute provides:
Any person having a claim under another policy, which claim arises out of the same facts which give rise to a covered claim, is first required to exhaust the person's right under the policy. *Any amount recovered or*

*recoverable by a person under another insurance policy shall be credited against the liability of the association* under 515B.5, subsection 1, paragraph "a".
*Iowa Insurance Guaranty Association v. Watts*, No. LACV 082665 (Pottawattamie County, October 4, 2002) (quoting Iowa Code § 515B.9(1) (emphasis in original).

found all defendants jointly and severally liable. We opine that the legislative intent behind the non-duplication of recovery provision was not to preclude contribution from PPCIGA in cases involving a finding of joint and several liability. Accordingly, we reverse that portion of the trial court's order directing payment of the verdict and we remand for a determination of satisfaction consistent with this opinion.

¶ 43 In her third issue raised on appeal, Dr. Evers contends that "the trial court erred by *apparently* ruling on an issue that was not before the court." (Evers' Brief at 22) (emphasis added). However, even a cursory review of the trial court opinion reveals that Judge Papalini did not issue a ruling on the precise amount payable as contribution from the MCARE Fund. Rather, Judge Papalini stated: "MIIX would be required to recover from the MCARE Fund (formerly the CAT Fund) *any amount payable*. All parties appear to agree that this amount is $1,800,000 ($900,000 on behalf of Dr. Evers and $900,000 on behalf of Hahnemann)." (Trial Court Opinion at 24) (emphasis added). We also note that Dr. Evers raised the issue of coverage in her post-trial motion, MIIX responded, specifically referring to the CAT Fund (now MCARE), in its Brief of Intervenor, and counsel for Dr. Evers did not object to discussion of the issue at oral argument.[35] However, in light of our disposition of the issue regarding satisfaction of the verdict, we remand to the trial court to ascertain the available insurance coverage and statutory funds with the assistance of the interested parties and the holdings herein.

¶ 44 For the foregoing reasons, we hold that Lynda Carrozza presented sufficient expert testimony to sustain the jury finding of negligence against the defendant doctors. We conclude that the trial court properly denied the defendants' motions for judgment n.o.v., a new trial and remittitur. In addition, we opine that a finding of joint and several liability against all defendants does not obviate the obligation of PPCIGA to contribute to the satisfaction of the verdict in this case. Therefore, we reverse that part of the trial court's order finding PPCIGA's obligation extinguished by the available limits of the MIIX policy.

¶ 45 Order reversed in part, affirmed in part, and case remanded for proceedings consistent with this opinion. Jurisdiction relinquished.

## APPENDIX A

### Trial Testimony (Partial) of John G. Pearce, M.D.

A: . . . As we have said earlier this morning, the task now is to analyze those calcifications using the three criteria we do [sic]: firstly, their shape; next, their distribution and next, their density. In evaluation of these calcifications, in the magnified view, one can see that there is one cluster of calcifications. They are not diffuse, all over the place. They are not in multiple clusters. There is one predominant cluster here that is of concern (indicating). This is the one for analysis.

When one looks closely at that, one describes very easily that there are multiple calcifications present.

---

**35.** The Commonwealth of Pennsylvania Insurance Department, MCARE Fund, filed an Amicus Curiae Brief in which the Fund argues against PPCIGA's position. In a footnote, the Fund briefly states that only $900,000 on behalf of Dr. Evers is available as Hahnemann's statutory aggregate coverage limit has been exhausted. (MCARE Fund Brief at 5, n. 5).

If one uses the optical magnifying glass on this magnified view, you can see that there is [sic] between seven and eight calcifications in that area.

This is not just one or two calcifications. The calcifications we described earlier occur in the duct [sic] begin as one or two irregular calcifications potentially and as more of those coalesce, you can get more calcifications and/or rod-like calcifications appearing.

So it is important to analyze carefully how many calcifications are there, are they in fact all in a row, are they in fact beginning to coalesce and create long rod-like calcifications or are they round and smooth.

If they were round and smooth, we wouldn't be worried about them. That's the feature of shape that would be benign.

**Q:** So how would you describe this cluster of calcifications?

**A:** This cluster of calcification[s], in my opinion, is pleomorphic. It is predominantly of different sizes and shapes. There are some that have a round appearance at one end of a rod-like calcification, and that is why one is concerned about there being a potential benign appearance to these calcifications and why they move to the indeterminate characteristic.

They have a smooth area in one area but others are irregular, and there are several of them beginning to join up.

So this is now approximately seven, maybe eight calcifications of different sizes, different shapes, that are indeterminate.

. . .

**Q:** . . . I would like you to assume that Dr. Greenbaum has testified and I'm sure will continue to testify that he sees four only, four calcifications in this cluster, and that when it's magnified on the magnification view, he sees one or at most, two calcifications. Do you agree with that interpretation?

**A:** No, I do not.

. . . .

**Q:** . . . [O]n the basis of your interpretation of the 1996 films, what is your official interpretation and conclusion and what is your recommendation to the physician who ordered them?

**A:** My opinion and conclusion of this series of films in 1996 that we have just discussed would be that there are [sic] indeterminate cluster of calcifications in the right upper outer quadrant and the possibility of ductal carcinoma in situ could not be excluded. . . .

My recommendation would be proceed to biopsy of these calcifications.

. . .

The definitive ruling out of ductal carcinoma in situ would be the job of the pathologist under the microscope. These are radiographic features that raised the question of possible ductal carcinoma in situ and, therefore, biopsy and tissue analysis is [sic] recommended.

. . . .

**Q:** Doctor, in your opinion, did Dr. Greenbaum, in his interpretation, act in accordance with the standard of care for radiologists?

**A:** In my opinion, he fell below the standard of care by misinterpreting the type of calcifications as benign.

**Q:** Is that your opinion within a reasonable degree of medical certainty, Doctor?

**A:** Yes.

(Pearce Trial Testimony, 1/14/03, at 113–121; R.R. at 164–172).

**Q:** We are going to the 1998 [films] that were taken at Allegheny University Imaging Services....

**A:** When a radiologist looks at films, we try to have the old films available for comparison and we are interested in looking at changes that may occur....

On the other side, where the calcifications were, there is [sic], again, calcifications still present. These calcifications *now have changed. They are not as obvious as they were before but they are definitely there, and if you take the magnifying glass and look at these, one can see that there are still multiple calcifications here and many more fine calcifications, fine irregular calcifications.*

Some of the more rod-like calcifications have resolved, have gone away.

. . . .

And so based on that, this study should also, when compared to the other [in 1996], shows a change in two different directions.

One change is [a] decrease in the number of coarse calcifications but the other change is in many more visible, little irregular calcifications, and so those changes raise a question.

. . . .

**Q:** Doctor, what is your recommendation as a radiologist looking at the 1998 film and in comparison with the 1996 film? What is your recommendation to Linda Carrozza's doctor?

. . . .

**A:** Based on the changes we described and the shapes and the fact that they are still present and the fact that they are indeterminate, I would recommend a biopsy.

**Q:** Was the failure—did the failure to recommend a biopsy in this case fall below the standard of care for radiologists?

**A:** In my opinion, yes.

**Q:** In your opinion, was Dr. Evers' interpretation of the 1998 films and in comparison with the 1996 films in accordance with the standard of care?

**A:** In my opinion, no.

**Q:** For the reasons that you stated?

**A:** Correct.

(*Id.* at 121–125; R.R. at 172–176).

On cross Pearce opined:

**Q:** Because they are in a cluster, they are pleomorphic and they are indeterminate. It is your opinion that they need to be biopsied, a strong recommendation needs to be made for biopsy. Correct?

**A:** By definition that means a need for biopsy.

**Q:** I just want to make sure I understand what your criteria are. They are indeterminate, they are pleomorphic, they are clustered. From those concerns that you reach, they must be biopsied. Is that right?

**A:** In my opinion, yes.

(*Id.* at 185; R.R. at 237)

On redirect Pearce testified:

**Q:** Are you aware of Dr. Greenbaum's testimony in which even Dr. Greenbaum agrees that indeterminate calcifications must be biopsied?

**A:** Yes.

(*Id.* at 220; R.R. at 272).

## APPENDIX B

### *Trial Testimony (Partial) of Paul M. Goldfarb, M.D.*

**Q:** Do you have an opinion as to what Lynda Carrozza's chances of survival would have been in 1996 if the lesion had been discovered at that time?

**A:** If discovered in 1996 and if in fact what she had was just the pre-invasive

cancer, her chance of cure would be at least 95 percent.

The lesion itself is a hundred percent curable, but none of us say a hundred percent, so 95 percent curable at the time.

Q: And what's the basis for your opinion?

A: We know from extensive literature that carcinoma in situ is not a true invasive cancer. It really hasn't spread out of the ducts, so if that's what she had and we treated it adequately, her chance of cure would be a hundred percent. . . .

Q: The fact that there was some invasiveness in 1998, in your opinion, what does that do to the chances of cure at that time?

A: It reduces it significantly because now you have a true cancer which has the potential for killing someone.

I think the chance of cure is dependent on how big the cancer is and whether it spread to the lymph nodes.

It is my impression, from reviewing the records, that more likely than not, she had a small cancer, less than two centimeters, because nobody could feel it. Clinically, there were no nodes felt. The X-ray showed no nodes involved, so if she had a small cancer with negative nodes, her chance of cure would be about 80 percent.

If she had a small cancer with a few lymph nodes involved, her chance of cure would be 75 to 80 percent as well because those women get chemotherapy and get other forms of therapy that enhance their chance of cure.

. . . .

Q: Do you believe that in 1996, and in your opinion, that in 1996, and for that matter, even 16 months before the diagnosis, that a mastectomy was essential in order to effectuate the maximum cure?

A: No. I think mastectomy was always a choice but it was not obligated [sic]. In '99 it's a different story.

Q: In your opinion, within a reasonable degree of medical certainty, what then were her chances of cure when the cancer was finally discovered in [September] of '99?

A: I guess for me as a surgeon, I would think from January. So in January of 2000, when she had the mastectomy, she had a lesion that was an invasive cancer of about three centimeters, but much more importantly, she had invasion of tumor cells into the small lymphatics of the skin of the breast, all right, and that carries a uniquely negative impact, and so we call it inflammatory breast cancer.

So when it is growing into those lymphatics, it means it is filling up all of the lymphatics in the breast, and so when she came in complaining that her breast had got [sic] much larger, it had gotten larger because the lymphatics are all plugged up and there's just this fluid filling the breast, and so that's why the breast is larger.

The redness is from the cancer cells growing in the skin of the breast, so that makes her the worst prognosis group in terms of local disease.

In terms of the lymph nodes at the time she had surgery, she had seven lymph nodes involved with tumor. So we think it is [sic] no lymph nodes is best. One to three lymph nodes is worse. Four to seven or four to nine is probably the third group, and more than ten is the worst known.

So seven nodes is significant. So she has a significant number of nodes. She has invasion of the skin of the breast. She has extensive pre-invasive cancer

filling up the whole breast, so I would argue that her chance of cure at that time was approximately 40 percent at best.

Q: So could you explain why there was such a dramatic difference, in your opinion, between her appearance and the status of her cancer in 1996 and 1998 versus when it came full bloom [sic] in 1999?

A: As we were talking about these changes that cancer cells go through as they become malignant and start to spread, there's a continued change, all right, and that rate of change is undetermined, and so in some patients you have this acceleration of the process.

So in this short period of time, she goes from no palpable mass, no obvious lymph node, into this full blown inflammatory breast cancer where the whole breast is filled with disease, which was a rapid change.

It had not been identified by her clinicians. It had not been identified by her, and I think it's a combination of factors.

One is the lymphatics filled, the breast suddenly swells up and two, I think biologically...she had a much more aggressive cancer at the time that it was diagnosed, and that was because of the progressive change.

(Goldfarb T.T., 1/15/03, at 260–266; R.R. at 312–317).